**HEINS IMPLEMENT COMPANY,
et al., Appellants,**

v.

**MISSOURI HIGHWAY & TRANS-
PORTATION COMMISSION,
et al., Respondents.**

No. 75313.

Supreme Court of Missouri,
En Banc.

Aug. 17, 1993.

Ed Dougherty, Lynne J. Bratcher, Philip R. Holloway, Kansas City, for appellants.

John W. Koenig, Jr., Sikeston, Rich Tiemeyer, Jefferson City, Roy A. Larson, Kansas City, Werner A. Moentmann, Richmond, for respondents.

PRICE, Judge.

The principal issue raised by this appeal is whether the modified common enemy doctrine should be applied to bar recovery by landowners and tenants whose property was flooded because a culvert under a highway bypass was not designed to handle the normal overflows from a nearby creek. We conclude that the common enemy doctrine no longer reflects the appropriate rule in situations involving surface water runoff and adopt a doctrine of reasonable use in its stead. We reverse the trial court's grant of judgment notwithstanding the verdict and remand.

### I. *Background*

A defendant's motion for judgment notwithstanding the verdict tests whether the plaintiff made a submissible case. Granting the judgment n.o.v. is the equivalent of directing a verdict at the close of all the evidence. *Glover v. Atchison, Topeka & Santa Fe R.R.*, 841 S.W.2d 211, 212 (Mo. App.1992). Judgment n.o.v. is proper as a matter of law, even though the defendant has not moved for a directed verdict, when the plaintiff's evidence establishes that an affirmative defense bars recovery. *Vinson v. Vinson*, 725 S.W.2d 121, 123 (Mo. App.1987). In making that determination, the Court takes the evidence in the light most favorable to the verdict, giving to the

prevailing party all reasonable beneficial inferences that can be drawn from the verdict and disregarding the unfavorable evidence. *Duren v. Kunkel*, 814 S.W.2d 935, 936 (Mo. banc 1991). The facts thus established by the record are as follows.

Appellants own or rent commercial and agricultural property along the bottomlands of Wakenda Creek, near the intersection of State Route 10 and U.S. Route 65 south of Carrollton. At this location, Route 10 runs east-west and Route 65 runs north-south. Before the obstructing bypass was built, Wakenda Creek regularly escaped its banks after heavy rainfalls. The floodwaters ran south over Route 10 and collected in a small artificial lake. When the lake's capacity was exceeded, the waters headed east over portions of appellants' lands before crossing Route 65 and returning to the creek farther downstream. These floods were always brief and had never reached any of appellants' buildings.

The Missouri Highway & Transportation Commission (MHTC) condemned some of the property owned by each of the appellants, or their predecessors in title, to build a bypass for Route 65. Mel Downs was the chief design engineer for this project. Downs testified that, although he knew Wakenda Creek was prone to flooding toward the north, he did not know that it also commonly overflowed to the south across Routes 10 and 65. Consequently, he designed a five-foot culvert under the bypass to handle normal rainfall drainage from the area west of the bypass. Downs admitted that this culvert was inadequate to drain the creek's other normal overflows.

Work on the bypass project began in 1975 and ended in 1977. The late 1970s happened to be a period of severe drought in the area. But in July 1981, heavy rains swelled Wakenda Creek once more. The errant waters coursed south and east over appellants' lands as they had done before. However, when they reached Route 65 they met the new bypass arching above Route 10. The raised bypass with its inadequate

drainage culvert acted as a dam, pooling the water on appellants' lands, where it remained for seven days. Commercial buildings were invaded by up to thirty inches of water. Numerous items of business and farm equipment and hundreds of acres of crops were destroyed. Similar floods recurred in June 1982, April 1983, February 1985, October 1985, and June 1990.

Appellants filed suit in 1985 against MHTC; Mel Downs; Frank Trager & Sons, the general contractor for the bypass project; and Carroll County Recreation Club, owner of the lake through which the floodwaters passed on their way to appellants' lands. The trial court granted summary judgment on all claims against the contractor, the engineer, and the club, and on the claims of negligence and nuisance against MHTC. The two remaining counts alleging inverse condemnation against MHTC were tried to a jury.

The jury returned verdicts in favor of appellants and assessed their damages at $298,175. Appellants filed motions to increase the jury's award or for a new trial on the issue of damages only. MHTC filed a motion for judgment n.o.v., arguing that appellants' action was barred by the original condemnation proceedings and by the common enemy doctrine. The trial court sustained MHTC's motion and entered judgment in its favor.

## II. *Res Judicata*

Appellants first challenge the grant of MHTC's motion for judgment n.o.v., asserting that their action was not barred by res judicata[1] by reason of the original condemnation proceedings for the construction of the bypass. They argue that MHTC waived this defense by failing to plead it in its answer.[2] MHTC contends that listing laches, estoppel, and waiver as defenses in its answer had the same effect as pleading res judicata. MHTC is wrong. Res judicata is a separate and distinct affir-

---

1. Sometimes also referred to as claim preclusion.

2. Rule 55.08 does not contain language indicating waiver; issues not pleaded simply are not raised in the lawsuit.

mative defense that must be specifically pleaded.[3]  *Rule 55.08.*

MHTC first raised the issue of claim preclusion in an oral motion to dismiss at trial, more than five years after the filing of its answer. The issue was not preserved in the answer, nor was any motion to amend the pleadings or other filing made which would timely notify appellants of MHTC's intent to present this defense. *See Rules 55.08, 55.33.*

Res judicata is not among the defenses explicitly authorized to be brought by motion pursuant to *Rule 55.27(a).* We have allowed it to be raised by motion to dismiss when uncontroverted facts demonstrate that a suit is groundless,[4] *King General Contractor v. Reorganized Church of Jesus Christ of Latter Day Saints,* 821 S.W.2d 495, 498–99 (Mo. banc 1991), although in practical effect the introduction of proof of the prior judgment transforms such a motion into one for summary judgment. *See Rule 55.27(a).*

This Court has acknowledged a similarity between res judicata and the defense of failure to state a claim upon which relief can be granted. *See King,* 821 S.W.2d at 498. The court of appeals, expanding the scope of this perceived relationship, has permitted a defendant to bring up claim preclusion by a motion to dismiss made after an answer had been filed, but well before trial. *See Johnson v. Raban,* 702 S.W.2d 134, 135–36 (Mo.App.1985). Neither of these cases, however, can be read to allow the raising of this defense so late in the trial process.

■ The facts that give rise to res judicata, by their very nature, are known to the defendant from the inception of a lawsuit. Accordingly, a defendant should not be able to hold preclusion in reserve as a "stealth defense" long after the time for raising substantive defenses has passed. *See Rule 55.27(f).* Res judicata, as well as other affirmative defenses, must be pleaded in the answer, *Rule 55.08;* or raised by amendment to the pleadings, *Rule 55.33;* or presented by a timely motion filed in compliance with *Rule 55.27(f)* or otherwise.

MHTC took no affirmative steps to raise its claim preclusion defense in a timely fashion. Appellants, however, did not object to the motion on this ground but simply addressed its substantive merits. Appellants also did not object to the introduction of evidence at trial regarding the prior condemnation proceedings. Consequently, the issue is deemed to have been tried by the implied consent of the parties and must be treated as though it had been raised in the pleadings. *Rule 55.33(b).*

■ Nonetheless, MHTC cannot prevail on this issue because no preclusion arises from the previous condemnation. MHTC argues that all damages "incidental or consequent" to the construction of the bypass should have been asserted in the condemnation action, and that appellants were put on notice as to the potential flooding problem by the description of the bypass project in the condemnation petition and the construction plans. *See Owen v. City of Springfield,* 741 S.W.2d 16, 19 (Mo. banc 1987), *cert. denied,* 486 U.S. 1043, 108 S.Ct. 2036, 100 L.Ed.2d 620 (1988). However, MHTC cannot rely on *Owen* given the facts of this case.

The construction plans in *Owen* specified that the sewer plant to be built in that case would use heavy pumps and would vent fumes into the atmosphere. The Court

---

**3.** We note also that the bare assertion of an affirmative defense, bereft of supporting facts, is insufficient as a matter of law. *ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.,* 854 S.W.2d 371, 383–84 (Mo. banc 1993).

**4.** The 1945 Code of Civil Procedure provided that ten specific objections "and other matters" could be raised by motion. *§ 509.290,* RSMo 1949. This Court ruled that res judicata was among those "other matters" that could be so raised even though it is an affirmative defense that must be pleaded, and even though it goes to the merits of the action and not to the jurisdiction of the court. *Hamilton v. Linn,* 200 S.W.2d 69, 71 (Mo.1947). Our current *Rule 55.27(a)* does not contain this additional language. However, the practice of raising res judicata by motion to dismiss has continued to be sanctioned by this Court even after the adoption of the current Rules of Civil Procedure.

held that, in these circumstances, the plaintiffs could anticipate noise and odor problems before the condemnation took place. For this reason, the plaintiffs were precluded from maintaining a second action seeking damages for these same factors after the plant was built. *Id.* at 19. In this case, MHTC presented no evidence that the parties expected an increased risk of flooding at the inception of the project. To the contrary, Mel Downs testified that he did not anticipate any backup problems when he designed the drainage culvert, other than on a fifty-year average frequency.

Appellants could not be expected to discern in the bypass plans a consequence that the designer himself did not foresee. It is true that appellants possessed a crucial bit of knowledge that Downs did not— the fact that the Wakenda regularly flooded Routes 10 and 65. However, appellants could not be aware of, and are not responsible for, this omission. The public has a right to expect that the designers of major public works projects will consider all relevant factors, especially when the necessary information is readily available.[5]

■ Moreover, the risk of subsequent flooding could not have been asserted in the original condemnation proceedings because it would have been considered too remote or speculative at that time. *State ex rel. Missouri Highway & Transp. Com'n v. Horine,* 776 S.W.2d 6, 12 (Mo. banc 1989). A judgment is not conclusive of any question that could not have been adjudicated in the case in which it was rendered. *Meier v. Thorpe,* 822 S.W.2d 556, 559 (Mo.App.1992) (*citing Ash Sheep Co. v. United States,* 252 U.S. 159, 170, 40 S.Ct. 241, 244, 64 L.Ed. 507 (1920)). Therefore, the fact that each of the appellants (or their predecessors) received some compensation in the initial condemnation does not bar this action for damages subsequently caused by unanticipated flooding.

### III. The Common Enemy Doctrine/Natural Flow
### (Civil Law) Rule/Reasonable Use Rule
#### A.

At the heart of this appeal lies the parties' dispute over the applicability of the modified common enemy doctrine, which has directed the law of surface waters in our state since 1884. *See Abbott v. Kansas City, St. Joseph & Council Bluffs R.R. Co.,* 83 Mo. 271, 286 (1884). It was initially formulated as follows:

> But in the case of surface water, which is regarded as a common enemy, [each owner] is at liberty to guard against it, or divert it from his premises, provided he exercises reasonable care and prudence in accomplishing that object.... [T]he owner of the dominant or superior heritage 'must improve and use his own lands in a reasonable way, and in so doing he may turn the course of, and protect his own land from, the surface water flowing thereon; and he will not be liable for any incidental injury occasioned to others by the changed course in which the water may naturally flow, and for its increase upon the land of others. Each proprietor, in such case, is left to protect his own lands against the common enemy of all.'

*Hosher v. K.C., St.J. & C.B. R.R. Co.,* 60 Mo. 329, 333 (1875) (*quoting McCormick v. K.C., St.J. & C.B. R.R. Co.,* 57 Mo. 433, 438 (1874)).[6]

Later decisions assuaged the Court's discomfort with the harshness of this doctrine by developing a series of mitigating exceptions. Unfortunately, the decisions have not always agreed on the scope of these exceptions or the reasoning behind them.

---

**5.** Harold Stewart, the MHTC area supervisor, testified that he kept daily logs of floods on Routes 10 and 65 from 1967 through 1979. This information was relayed to the MHTC Kansas City district office by radio or telephone. Mel Downs stated that "I never got my hands on" Stewart's log, although he was aware of its existence and even requested to see it once.

**6.** This rule is applied directly to private persons and indirectly to public entities. Any action of a public entity found to be privileged under the common enemy doctrine does not infringe upon a viable property right of adjacent landowners, and therefore it does not constitute a taking. *Haferkamp v. City of Rock Hill,* 316 S.W.2d 620, 630 (Mo.1958).

In fact, a recent opinion by our court of appeals flatly states that the precedents cannot be reconciled. *Brown v. H & D Duenne Farms, Inc.*, 799 S.W.2d 621, 628 (Mo.App.1990).

As the doctrine stands today, upper landowners may be required to act with *some* degree of care when discharging surface water onto lower-lying lands. *Hansen v. Gary Naugle Const. Co.*, 801 S.W.2d 71, 75 (Mo. banc 1990); *Looney v. Hindman*, 649 S.W.2d 207, 211 (Mo. banc 1983).[7] On the other hand, lower owners have retained considerable freedom in blocking the flow of surface water onto their lands, subject only to the proviso that they may not dam a natural drainway. *Happy v. Kenton*, 247 S.W.2d 698, 701 (Mo.1952). Moreover, it has been recently stated that abstract reasonableness is not an issue when a lower owner obstructs the flow of diffuse surface water, and that the lower owner need not establish a good motive or good faith for blocking the water. *Millard Farms v. Sprock*, 829 S.W.2d 1, 3 (Mo.App.1991).[8]

The case at bar fits none of the currently recognized exceptions to the common enemy doctrine. MHTC asserts that its failure to provide adequate drainage for the bypass is not actionable because it involves neither the collection and discharge of surface waters, nor the blocking of a natural drainway. The Court of Appeals, Western District, predicated its reversal of the judgment n.o.v. in MHTC's favor on a newly recognized "negligent construction" exception. This exception is in turn based upon the following passage from *Siegfried:*

> *Abbott* recognizes that there is a duty of due care with regard to the diversion or impeding of the flow of surface water, and this proposition is reiterated in subsequent cases. The cases give us no guidance, however, as to what act or omissions on the part of a lower owner may be found to be negligent. *Negligence possibly might be based on carelessness during construction,* or on the use of a dangerous process or method when a more secure one is available, but these possibilities are foreign to the record before us.

649 S.W.2d at 897 (emphasis added).

MHTC contends that its negligence is not at issue because a duty of care has previously been imposed only on upper owners seeking to discharge collected water onto lower owners, and never on lower owners who have merely dammed surface water to keep it away from their own property. *Camden Special Road Dist. of Ray Cty. v. Taylor*, 495 S.W.2d 93, 98 (Mo.App.1973); *Siegfried*, 649 S.W.2d at 897; *Millard Farms*, 829 S.W.2d at 3. Indeed, the pas-

---

7. There is some inconsistency even among these cases. *Looney* implies that an upper owner may not discharge water into a natural drainway in increased and destructive quantities, 249 S.W.2d at 211, while *Hansen* holds that a discharge that does not exceed the capacity of a natural drainway is not actionable, even when it is destructive to lower owners, 801 S.W.2d at 75.

8. This, despite the clear admonition of the *Abbott* court that, in building a roadbed and track through bottomlands, the defendant railroad was bound to exercise reasonable care and skill and "to see that no unnecessary injury was done to adjoining proprietors, by the obstruction and deflection of surface water incident to such careful and skilful construction of the same." 83 Mo. at 280–81 (emphasis added). This confusion over the scope and applicability of the duty of care announced in *Abbott* is perhaps the biggest difficulty our courts have encountered in applying the common enemy doctrine. *Haferkamp* cited "the often repeated general statement of our courts to the effect that the common enemy doctrine must be exercised within reasonable limits." 316 S.W.2d at 626–27. In

contrast, *Camden* held that the reasonable use and due care language in *Abbott* applied only to collection and discharge cases such as *Haferkamp*, which were characterized as "a unique and limited factual situation to which the 'common enemy doctrine' has no application." 495 S.W.2d at 98. Likewise, *Looney* described the due care language as a "modification" of the doctrine. 649 S.W.2d at 210 n. 1. This notion was disputed by the dissent in *M.H. Siegfried Real Estate v. City of Independence*, 649 S.W.2d 893, 900 n. 2 (Mo. banc 1983) (Higgins, J., dissenting). The principal opinion in *Siegfried*, as discussed below, approved of the result arrived at in *Camden* and threw cold water on the due care requirement. *Id.* at 897. *Millard* ignores these latter precedents and treats the obligation to act "reasonably without recklessness or negligence" as an integral part of the doctrine. 829 S.W.2d at 2. Then, in contradiction of this statement, *Millard* asserts that a lower owner need not establish the reasonableness of its conduct in blocking surface water. *Id.* at 3.

sage from *Siegfried* quoted above goes on to state that neither the court nor the jury has a roving commission to determine whether the lower owner's conduct is "unreasonable," and that the mere construction of a dam cannot be found to be negligent even though flooding of the upper lands can be foreseen.[9] 649 S.W.2d at 897.

MHTC also argues that a negligent construction exception is absurd because it makes a defendant liable for inadvertently accomplishing what it could set out to do *intentionally* with complete impunity. It is apparent that the confusion resulting from the various applications of the modified common enemy doctrine in Missouri now justifies a reexamination of our surface water law.

### B.

American courts have developed three distinct approaches to controversies involving the diversion or impoundment of diffuse surface waters: the civil law or natural flow rule, the common enemy doctrine, and the reasonable use rule.[10] With the exception of a few Louisiana cases, which had applied the civil law rule as early as 1812, the earliest cases espousing each of the three doctrines appeared independently of one another during the middle years of the last century.[11] In the quaint custom of common law courts, these concepts found expression in three well-worn Latin maxims: *Aqua currit, et debet currere, ut currere solebat ex jure naturae* ("Water runs, and ought to run, as it is used to run from the law of nature"); *cujus est solum, ejus est usque ad coelum et ad inferos* ("whose is the soil, his it is even to the skies above and to the depths below"); and *sic utere tuo ut alienum non laedas* ("use

your property so as not to injure that of another").

Extensive analyses of these doctrines have been undertaken by several courts; they need not be repeated here.[12] Briefly, the civil law rule appears to be derived from the French and Spanish civil codes, which in turn have their roots in Roman law. It imposes liability for any interference with the natural surface drainage pattern that causes injury to another's land. Each parcel of land is said to be subject to a natural servitude or easement for the flow of surface water, so that the lower or servient estate is obliged to accept the water that would naturally drain into it, and the higher or dominant estate is precluded from retaining the water that would naturally drain out of it.

The civil law doctrine, with its comforting allusions to the "natural" law, was sometimes adopted or retained as a gentler alternative to the perceived crudity of the common enemy doctrine. Many courts rejected it, however, out of concern that it would impede the development of land and thus would retard the march of progress that was so dear to the nineteenth century. Courts also encountered difficulties in determining "what was the exact course of the 'natural flow' of the surface water before the bulldozers arrived on the scene." *Butler v. Bruno*, 341 A.2d at 738.

The common enemy doctrine, in contrast, was once believed to derive from the English common law, but it is now accepted that the English law of surface waters was unsettled when the doctrine first appeared in Massachusetts. It is based on an exaggerated view of the notion of absolute ownership of land, as reflected by the rather

---

9. *See* n. 7 *supra.*

10. *See generally* Kinyon & McClure, *Interferences with Surface Waters*, 24 Minn.L.Rev. 891 (1940); Beck, *Waters and Water Rights*, vol. 2, § 10.03 (1991). The ensuing discussion is freely adapted from these two sources without further attribution.

11. According to Kinyon & McClure, *supra* n. 10, these cases are: *Martin v. Riddle*, 26 Pa.St. 415 (1848, reported 1852) (civil law); *Luther v. Win-*

*nisimmet Co.*, 9 Cush. 171 (Mass.1851) (common enemy); and *Bassett v. Salisbury Mfg. Co.*, 43 N.H. 569 (1862) (reasonable use).

12. *See, e.g., Keys v. Romley*, 64 Cal.2d 396, 50 Cal.Rptr. 273, 412 P.2d 529 (1966); *Armstrong v. Francis Corp.*, 20 N.J. 320, 120 A.2d 4 (1956); *Pendergrast v. Aiken*, 293 N.C. 201, 236 S.E.2d 787 (1977); *Butler v. Bruno*, 341 A.2d 735 (R.I. 1975).

primitive analysis that justified its original formulation:

> [T]he right of a party to the free and unfettered control of his own land above, upon and beneath the surface cannot be interfered with or restrained by any considerations of injury to others which may be occasioned by the flow of mere surface water in consequence of the lawful appropriation of land by its owner to a particular use or mode of enjoyment.

*Gannon v. Hargadon*, 10 Allen 106, 110 (Mass.1865). As a consequence of this short-sighted focus on "the due exercise of dominion over [one's] own soil", *id.*, the doctrine completely ignores the fact that invasion by an unwanted and destructive volume of water might otherwise have been viewed as a classic trespass.

At one time, the common enemy doctrine held sway over most of the United States. Many courts were persuaded that it would best promote land development and economic growth, particularly as compared to the civil law rule. *See, e.g., Abbott*, 83 Mo. at 286. On the other hand, the practical consequence of adherence to this rule has been described as "a neighborhood contest between pipes and dikes from which 'breach of the peace is often inevitable.'" R. Timothy Weston, *Gone with the Water: Drainage Rights and Storm Water Management in Pennsylvania*, 22 Vill.L.Rev. 901, 908 (1977). The enduring objection to the common enemy doctrine was aptly put by a member of this Court: "This is a mere reiteration of the doctrine of '*sauve qui peut*,' or as popularly translated into our vernacular 'the devil take the hindmost.'" *Shane v. K.C., St.J. & C.B. R.R. Co.*, 71 Mo. 237, 252 (1879).

Predictably, neither of these rigid doctrines has proved workable in the real world. In short order each was encrusted with a myriad of mitigating exceptions, in some cases harsh and capricious and in most cases confusing and unpredictable. Perhaps the most telling fact is that courts applying these ostensibly opposite rules often reach similar results. In their frequently cited analysis of surface water law, Kinyon and McClure concluded that "in many types of situation, though by no means in all, the actual decisions under both rules are harmonious." 24 Minn. L.Rev. at 934. Over the years, through the accretion of complementary exceptions and qualifications, the two doctrines have been laboriously drifting towards confluence— and, not coincidentally, toward the third doctrine of surface water use.

The rule of reasonable use differs from the other two rules in that it does not purport to lay down any specific rights or privileges with respect to surface waters, but leaves each case to be determined on its own facts, in accordance with general principles of fairness and common sense. Under the common enemy and civil law regimes, the law of surface waters is treated as a branch of property law. The reasonable use doctrine has a dual nature. While it has been recognized as a distinct property law concept, *Highview North Apartments v. County of Ramsey*, 323 N.W.2d 65, 72 (Minn.1982); *Bush v. City of Rochester*, 191 Minn. 591, 255 N.W. 256 (1934), it has also been recognized as a tort. Kinyon & McClure, 24 Minn.L.Rev. at 936–38. The *Restatement (Second) of Torts*, § 833 (1977), declares that "[a]n invasion of one's interest in the use and enjoyment of land resulting from another's interference with the flow of surface water" is to be analyzed as a form of nuisance.

Under either theory, the thrust and elements of the rule of reasonableness are the same: "each possessor is legally privileged to make a reasonable use of his land, even though the flow of surface waters is altered thereby and causes some harm to others, but incurs liability when his harmful interference with the flow of surface waters is unreasonable." *Armstrong v. Francis Corp.*, 120 A.2d at 8. Reasonableness is a question of fact, to be determined in each case by weighing the gravity of the harm to the plaintiff against the utility of the defendant's conduct. *Pendergrast v. Aiken*, 236 S.E.2d at 797. Liability arises when the defendant's conduct is either (1) intentional and unreasonable; or (2) negligent, reckless, or in the course of an abnormally dangerous activi-

ty. *Restatement (Second) of Torts* § 822 (1977). Perhaps the rule can be stated most simply to impose a duty upon any landowner in the use of his or her land not to needlessly or negligently injure by surface water adjoining lands owned by others, or in the breach thereof to pay for the resulting damages. The greatest virtue of the reasonable use standard is its ability to adapt to any set of circumstances while remaining firmly focused on the equities of the situation.

Some have suggested that the reasonable use rule might be too unpredictable for users of land to follow, or for courts to administer. *See, e.g., Argyelan v. Haviland,* 435 N.E.2d 973, 976 (Ind.1982). However, those fears have not material-ized. Today, the overwhelming majority of American jurisdictions have either adopted the reasonable use rule outright, or have overlaid a reasonableness requirement upon the existing civil law or common enemy jurisprudence—which, in practical effect, may be a distinction without a difference. Only a handful of courts cling to the common enemy or civil law rule and a few employ different rules in different situations.[13]

### C.

■ Upon consideration, we are persuaded that the common enemy doctrine, even as modified, has outlived its usefulness in our state. The rule's harsh origins and labyrinth of exceptions are unduly

**13.** The reasonable use rule has been adopted by the following courts: *Weinberg v. Northern Alaska Dev. Corp.,* 384 P.2d 450, 452 (Alaska 1963); *Page Motor Co., Inc., v. Baker,* 182 Conn. 484, 438 A.2d 739, 741 (1980); *Weldin Farms, Inc., v. Glassman,* 414 A.2d 500, 505 (Del.Super.Ct.1980); *Westland Skating Center, Inc., v. Gus Machado Buick,* 542 So.2d 959, 962 (Fla. 1989); *Rodrigues v. State,* 52 Haw. 156, 472 P.2d 509, 516 (1970); *Klutey v. Commonwealth, Dept. of Highways,* 428 S.W.2d 766, 769 (Ky.1967); *Tucker v. Badoian,* 376 Mass. 907, 384 N.E.2d 1195, 1201 (1978); *Enderson v. Kelehan,* 226 Minn. 163, 32 N.W.2d 286, 289 (1948); *Hall v. Wood,* 443 So.2d 834, 840 (Miss.1983); *County of Clark v. Powers,* 96 Nev. 497, 611 P.2d 1072, 1076 (1980); *City of Franklin v. Durgee,* 71 N.H. 186, 51 A. 911, 913 (1901); *Armstrong v. Francis Corp.,* 20 N.J. 320, 120 A.2d 4, 10 (1956); *Pendergrast v. Aiken,* 293 N.C. 201, 236 S.E.2d 787, 796 (1977); *Jones v. Boeing Co.,* 153 N.W.2d 897, 904 (N.D.1967); *McGlashan v. Spade Rockledge Terrace Condo Dev. Corp.,* 62 Ohio St.2d 55, 402 N.E.2d 1196, 1200 (1980); *Butler v. Bruno,* 115 R.I. 264, 341 A.2d 735, 740 (1975); *Sanford v. University of Utah,* 26 Utah 2d 285, 488 P.2d 741, 744 (1971); *Morris Associates, Inc., v. Priddy,* 181 W.Va. 588, 383 S.E.2d 770, 774 (1989); *State v. Deetz,* 66 Wis.2d 1, 224 N.W.2d 407, 416 (Wis.1974).

Courts that have imposed a reasonableness requirement upon the civil law rule include: *Keys v. Romley,* 64 Cal.2d 396, 50 Cal.Rptr. 273, 412 P.2d 529, 536–37 (1966); *Templeton v. Huss,* 57 Ill.2d 134, 311 N.E.2d 141, 146 (1974); *Burgess v. Salmon River Canal Co.,* 119 Idaho 299, 306, 805 P.2d 1223, 1230 (1991); *O'Tool v. Hathaway,* 461 N.W.2d 161, 163 (Iowa 1990); *Whitman v. Forney,* 181 Md. 652, 31 A.2d 630, 633 (1943). Those that have done so for the common enemy doctrine include: *Pirtle v. Opco, Inc.,* 269 Ark. 862, 601 S.W.2d 265, 267 (1980); *Mattoon v. City of Norman,* 617 P.2d 1347, 1349 (Okla.1980); *Irwin v. Michelin Tire Corp.,* 288 S.C. 221, 341 S.E.2d 783, 785 (1986); *Mullins v. Greer,* 226 Va. 587, 311 S.E.2d 110, 112 (1984).

The following courts adhere to the civil rule: *Fisher v. Space of Pensacola, Inc.,* 483 So.2d 392, 393 (Ala.1986); *Dougan v. Rossville Drainage Dist.,* 243 Kan. 315, 757 P.2d 272, 275 (1988); *Lee v. Schultz,* 374 N.W.2d 87, 90 (S.D.1985); *Powers v. Judd,* 150 Vt. 290, 553 A.2d 139, 140 (1988). The common enemy doctrine is observed by the following courts: *Gillespie Land & Irrigation Co. v. Gonzalez,* 93 Ariz. 152, 163, 379 P.2d 135, 146 (1963); *Ballard v. Ace Wrecking Co.,* 289 A.2d 888, 890 (D.C.1971); *Argyelan v. Haviland,* 435 N.E.2d 973, 976 (Ind.1982); *State by & through Dept. of Highways v. Feenan,* 231 Mont. 255, 752 P.2d 182, 184 (1988); *Buffalo Sewer Auth. v. Town of Cheektowaga,* 20 N.Y.2d 47, 281 N.Y.S.2d 326, 329–30, 228 N.E.2d 386, 389 (1967).

Among the courts that observe more than one rule are the following: Nebraska applies the common enemy rule to diffuse surface water, but switches to the civil law rule once the water has reached a drainway. *Nu–Dwarf Farms v. Stratbucker Farms,* 238 Neb. 395, 470 N.W.2d 772, 777 (1991). Pennsylvania applies the civil law rule in rural areas and the reasonable use rule where artificial uses of land exist. *Westbury Realty Corp. v. Lancaster Shopping Center, Inc.,* 396 Pa. 383, 152 A.2d 669, 671–72 (1959). This rule has been modified by statute. *See Pastore v. State System of Higher Educ.,* 152 Pa.Cmwlth. 111, 618 A.2d 1118, 1121 (1992). In Texas, the civil law rule governs the conduct of landowners whose title derives from Spain and Mexico, whereas the common enemy doctrine applies to landowners whose title derives from the Republic or the State of Texas. The conduct of non-owners, however, is subject to the civil law rule by statutory mandate. *Kraft v. Langford,* 565 S.W.2d 223, 229 (Tex.1978).

complicated and confusing and threaten arbitrary and unjust results. In its stead, we adopt the rule of reasonable use as the one most likely to promote the optimum development and enjoyment of land, while ensuring that their true costs are equitably distributed among the competing interests at hand.[14] *See Armstrong v. Francis Corp.,* 120 A.2d at 10. Moreover, its simplicity of concept will allow for a more flexible and sure application to the many factual situations that inevitably will arise.

The standard we sanction today is in harmony with the most basic tenets of our law. "Reasonableness is the vital principle of the common law." *City of Franklin v. Durgee,* 51 A. at 913. Reasonable use concepts already govern the rights of users of our watercourses, subterranean streams, and subterranean percolating waters. *See Bollinger v. Henry,* 375 S.W.2d 161, 166 (Mo.1964); *Higday v. Nickolaus,* 469 S.W.2d 859, 869 (Mo.App.1971). To some extent, they have also applied to upper land owners through the modified common enemy doctrine. Their extension to the management of all diffuse surface waters finally "bring[s] into one classification all waters over the use of which controversy may arise." *Higday,* 469 S.W.2d at 869–70.

### D.

All that remains then is the application of this standard to the facts before us. The instructions given to the jury have not been preserved, but the record reflects that the cause was tried and submitted as an inverse condemnation claim. As it happens, that submission was entirely correct, because MHTC is empowered to exercise the right of eminent domain. *§ 227.120,* RSMo 1986.

■ Article I, § 26 of the Missouri Constitution provides: "That private property shall not be taken or damaged for public use without just compensation." We have considered whether a "taking" has occurred in surface water situations in terms of the common enemy doctrine. *Haferkamp v. City of Rock Hill,* 316 S.W.2d 620, 630 (Mo.1958). There, it was noted:

If defendants' acts in disposing of the surface water were within the permitted limits, there could be no taking or damaging of plaintiffs' property within the meaning of Art. I, § 26, Constitution of Missouri 1945.

This approach would also hold true when the reasonable use rule is substituted for the common enemy doctrine. Accordingly, we hold that when, as a result of a public works project, private property is damaged by an unreasonable diversion of surface waters, whether by design or by mistake, the owner may bring an action for inverse condemnation.[15]

■ In the case before us, the extent and regularity of the flooding caused by the bypass, coupled with the MHTC's negligence in installing an inadequate culvert would be sufficient to allow a jury to find an unreasonable use and, thereby, an inverse condemnation. Thus, the judgment n.o.v. appears to be in error. However, because the actual instructions which were

**14.** A close examination of our earliest cases in this area suggests that our predecessors also sought to find the same balance we strike today. Prior to the seminal decision in *Abbott,* this Court twice applied the civil law rule to surface water conflicts. *See Shane,* 71 Mo. at 251; *Laumier v. Francis,* 23 Mo. 181, 184 (1856). At other times the Court shifted its support to the common enemy doctrine, but in every such instance it imposed a requirement of reasonableness as a condition of the freedom of action bestowed by that doctrine. *See Benson v. The Chicago & Alton R.R. Co.,* 78 Mo. 504, 512 (1883); *Hosher,* 60 Mo. at 333; *McCormick,* 57 Mo. at 438; *Jones v. Hannovan,* 55 Mo. 462, 467 (1874). *Abbott* itself, in definitively adopting the common enemy doctrine, repeatedly recognized a requirement to restrain those engaged in public and private improvements "from unnecessarily or carelessly injuring another." 83 Mo. at 286. Interestingly, these early cases make no mention of the explicit reasonableness standard, or of the New Hampshire precedents that developed it.

**15.** It has been suggested that even a reasonable diversion of surface water by a public entity constitutes a "taking". *Wilson v. Ramacher,* 352 N.W.2d 389, 394 (Minn.1984); *Board of Transp. v. Terminal Warehouse Corp.,* 300 N.C. 700, 268 S.E.2d 180, 183 (1980). Because the diversion here apparently was not found to be reasonable, we do not reach this constitutional issue.

used to submit the case to the jury are not available, we remand the case to the trial court. If the instructions submitted this matter to the jury consistent with the principles announced here, judgment for plaintiff should be entered in accordance with the verdict, subject only to the trial court's ruling at IV, infra. If not, a new trial should be ordered.

## IV. *The Motion for New Trial*

Appellants challenge the trial court's failure to grant their motions to increase the jury award or for a new trial on damages only. Appellants requested an enhanced award under the authority of *§ 537.068*, RSMo Supp.1992. However, that statute applies only to causes of action accruing after July 1, 1987. *§ 537.069*, RSMo Supp. 1992. Appellants cannot rely on *§ 537.068* because the initial taking in this case occurred some six years before that statute's effective date.

In the alternative, appellants argue that they should have been granted a new trial on damages alone because the jury award was inadequate as a matter of law. Appellants presented their own testimony and that of one expert witness concerning the amount of damages. The witnesses estimated total losses at approximately $1,456,-000 to $1,523,000. MHTC introduced no evidence on this issue.

The jury issued an award of $298,175, roughly 20% of the record estimates. Individual appellants, however, fared very differently from one another. The three parties with the smallest claims recovered 75% of their estimated losses, but most received from 30% to as little as 5% of their estimated losses. Appellants would infer jury bias and prejudice from these "shockingly meager" returns. They allege that MHTC's

repeated and improper allusions to appellants' comparative fault adversely affected their recovery. *See State ex rel. State Highway Com'n v. Recker*, 648 S.W.2d 568, 573 (Mo.App.1983).[16]

■■ The decision whether to grant a new trial based on the size of the jury's award rests with the trial court. *State ex rel. State Highway Com'n v. Belvidere Dev. Co.*, 315 S.W.2d 781, 784 (Mo.1958). In particular, appellate courts defer to the trial court's ability to judge the credibility of witnesses and to assess the impact of alleged trial errors upon the jury. *State ex rel. State Highway Com'n v. Tighe*, 386 S.W.2d 115, 119 (Mo.1964); *City of St. Louis v. Gruss*, 263 S.W.2d 387, 394 (Mo. 1954).

■■ An appellate court may interfere, however, where the damages in condemnation are grossly excessive or inadequate. *Missouri Public Service Co. v. Argenbright*, 457 S.W.2d 777, 782 (Mo.1970); *City of St. Louis v. Smith*, 325 Mo. 471, 30 S.W.2d 729, 732 (1930). Since the appellate court does not weigh the evidence, it is limited to inquiring whether the jury's verdict is supported by substantial evidence, or in other words, "whether the amount of the verdict is responsive to the evidence on the issue of damages". *Nichols v. Blake*, 395 S.W.2d 136, 141 (Mo.1965). The opinion of a single qualified witness constitutes substantial evidence. On the other hand, the judgment will not be disturbed because of conflicting testimony, or because there is a seeming preponderance of the evidence one way or another, or because the amount of the verdict does not match the opinion of any one expert witness. *Argenbright*, 457 S.W.2d at 782.

More specifically, it has been argued that a jury may not go outside the evidence: it

---

**16.** Under a traditional tort theory, the plaintiff's comparative fault is relevant. Because of its dual nature, there may be occasions where it is relevant under the reasonable use doctrine. Here, appellants' claims are in inverse condemnation. Accordingly, appellants technically do not claim tort damages, but instead seek damages for a taking of certain property rights—in this case, an easement for the drainage of surface water. Thus, evidence of "comparative fault" as such might not be admissible, but substantially similar evidence might be admissible to show that plaintiff failed to mitigate damages or to show that the right taken was of lesser value than it would be in the case of other lands not subject to periodic surface water difficulties. The trial court is in the best position to determine if this evidentiary issue warrants the requested relief.

may not exceed the damages claimed by the owner, nor may it fall below the lowest estimate testified to by a witness. 29A *C.J.S. Eminent Domain* § 330, at 685 (1992); 5 *Nichols on Eminent Domain* § 17.3, at 41 (3d ed. 1975). At least one division of our court of appeals was unwilling to accept the "floor" established by this rule. *See State ex rel. State Highway Com'n v. Kemper*, 542 S.W.2d 798, 804 (Mo.App.1976). The court reasoned that the jury is free to disbelieve any or all of the evidence presented by the party who bears the burden of proof—in condemnation cases, the landowner. Thus, the court held that a judgment is within the range of all the evidence if it does not exceed the highest amount in the record, and does not fall below the lowest amount shown by the party without the burden of proof. *Id.* at 805.

This is indeed a difficult issue. While the jury may disbelieve an owner or an owner's expert as to valuation, the record must establish some basis for the jury's verdict, whether it be evidence presented by the condemnor, evidence elicited by the condemnor on cross-examination of an owner or expert, or some reasonable construction of a portion of the owner's evidence. To this extent, we question the holding in *Kemper.*

In this case, however, it is premature for us to attempt to resolve this problem. Appellants' motion for new trial was heard and decided at the same time as MHTC's motion for judgment n.o.v. After the trial court became convinced that MHTC was entitled to a judgment n.o.v. as a matter of law, any further consideration of the merits of appellants' motion for new trial would have been futile. This Court is not inclined to make such a determination in the first instance, based only on the cold record before us. Accordingly, the denial of appellants' motion for new trial is reversed and the cause is remanded to the trial court with directions to reconsider and decide the motion on its merits.

### V. *The Summary Judgments*

Appellants also contest the trial court's grant of summary judgment dismissing the remaining counts in their petition. On review of a defendant's motion for summary judgment, this Court views the record in the light most favorable to the plaintiff, according to plaintiff all reasonable inferences that may be drawn from the evidence. Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits filed in connection with the motion, demonstrate that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *Rule 74.04(c).*

### A. *MHTC*

Appellants argue that their negligence and nuisance claims against MHTC were not barred by sovereign immunity or the statute of limitations.[17] However, when private property is damaged by a nuisance operated by an entity having the power of eminent domain, the proper remedy is an action in inverse condemnation.[18] *Green Acres Land & Cattle Co. v. State*, 766 S.W.2d 649, 651 (Mo.App.1988); *Harris v. Missouri Dept. of Conservation*, 755 S.W.2d 726, 729 (Mo.App.1988). The fact that the nuisance is alleged to have been caused by the public entity's negligence is immaterial. *See Page v. Metropolitan St. Louis Sewer Dist.*, 377 S.W.2d 348, 353–54

17. MHTC contends that the limitation period began to run when the bypass was completed and had expired before this suit was filed. However, the statute is triggered only when damage is sustained and is capable of ascertainment. *§ 516.100*, RSMo 1986. Appellants' damages became ascertainable when the first flood occurred, in July 1981. *See Scantlin v. City of Pevely*, 741 S.W.2d 48, 50 (Mo.App.1987); *Person v. City of Independence*, 114 S.W.2d 175, 179 (Mo.App.1938). Thus, appellants' suit was timely filed in 1985.

18. Of course, alleging a nuisance is not essential. Inverse condemnation is the proper remedy whenever a condemning authority takes or damages private property for a public use without just compensation. *Mo. Const., art. I, § 26; State ex rel. State Highway Comm'n v. Swink*, 537 S.W.2d 556, 558 (Mo. banc 1976).

(Mo.1964). Because MHTC is empowered to exercise the right of eminent domain, § 227.120, RSMo 1986, the trial court did not err in dropping appellants' nuisance and negligence claims while retaining their inverse condemnation claims.

### B. *Frank Trager & Sons*

■ Appellants next challenge the dismissal of their negligence claim against Frank Trager & Sons, the general contractor. Once an owner accepts a structure built to the owner's specifications, however, a general contractor is usually not liable to persons with whom he did not contract. *Gast v. Shell Oil Co.*, 819 S.W.2d 367, 370 (Mo. banc 1991). There are significant exceptions to this rule, such as: where the completed work contains a hidden defect or departure from specifications that is not apparent to the owner upon reasonable inspection; or where a specification is so imperfect or improper that the contractor should realize it will result in an inherently unsafe structure or condition. *Id.* at 371. Nonetheless, appellants presented no evidence to support the application of these or any other exceptions in this case.

The exhibits attached to Trager's affidavit show that its work was accepted by MHTC on August 19, 1976. We accept Trager's uncontroverted evidence as true for purposes of summary judgment. MHTC's acceptance of the completed work in accordance with its specifications bars the negligence claim and entitles Trager to summary judgment as a matter of law.[19]

### C. *Recreation Club*

■ Appellants also contest the dismissal of their negligence, nuisance, and breach of covenant claims against Carroll County Recreation Club. The club's liability is predicated on the following covenant found within a 1958 deed:

> Grantee shall construct or maintain sufficient levees necessary to prevent water from escaping from the lands herein conveyed on to the lands adjacent thereto on the east, and Grantee shall provide necessary outlets through said levees, with flood gates installed thereon, to provide drainage of the lands located to the east of the premises hereby conveyed through said levee and to allow the uninterrupted flow of water through said levees from the south.

Appellants contend that this provision requires the club "to prevent water from escaping to adjacent lands to the east." But the covenant by its own terms applies only to waters "escaping from the lands herein conveyed". Appellants admit that the floodwaters *passed through* the club's land and continued east to their lands. This water did not originate in the club's lake, but in Wakenda Creek. The language cited cannot reasonably be construed to oblige the club to hold back the creek's overflows. Summary judgment was properly granted to the club.[20]

### D. *Mel Downs*

■ Finally, appellants contest the summary judgment dismissing their negligence claim against Mel Downs. Downs counters that, as a public employee, he is immunized from liability by both the "official immunity" and "public duty" doctrines, two closely related concepts that serve similar functions.

■ The public duty doctrine shields public officers, and the governmental bodies that employ them, from liability for injuries or damages resulting from the officer's breach of a duty owed to the general public as opposed to particular individuals. *Stacy v. Truman Medical Ctr.*, 836 S.W.2d 911, 921 (Mo. banc 1992). Official immunity, on the other hand, protects public officials acting within the scope of their authority from liability for injuries arising from their discretionary acts or omissions. *Kanagawa v. State By and Through Freeman*, 685 S.W.2d 831, 835 (Mo. banc 1985). This protection is extended in the hope of

---

**19.** Our conclusion makes it unnecessary to discuss appellants' sovereign immunity and statute of limitations arguments.

**20.** Our conclusion makes it unnecessary to discuss appellants' common enemy and statute of limitations arguments.

promoting the effective administration of public affairs by removing the threat of personal liability from those officials who must exercise their best judgment in conducting the public's business. *Id.* at 836; *Green v. Denison,* 738 S.W.2d 861, 865, 866 (Mo. banc 1987).

Appellants attack the applicability of the public duty doctrine to Downs on two fronts. First, they argue that the legislature's partial abrogation of sovereign immunity, *§ 537.600,* RSMo 1986 has effected a corresponding abrogation of the public duty doctrine. For support, they cite the example of several courts that have abolished the doctrine after finding it to be closely related to or dependent upon sovereign immunity.[21] *See, e.g., Adams v. State,* 555 P.2d 235, 241–42 (Alaska 1976); *Ryan v. State,* 134 Ariz. 308, 310, 656 P.2d 597, 599 (1982); *Leake v. Cain,* 720 P.2d 152, 160 (Colo.1986); *Commercial Carrier Corp. v. Indian River Cty.,* 371 So.2d 1010, 1016 (Fla.1979); *Schear v. Board of County Comm'rs of Bernalillo County,* 101 N.M. 671, 673–74, 687 P.2d 728, 730–31 (1984); *Brennen v. City of Eugene,* 285 Or. 401, 591 P.2d 719, 725 (1979); *Coffey v. City of Milwaukee,* 74 Wis.2d 526, 247 N.W.2d 132, 139 (1976). This argument, however, was rejected in *Beaver v. Gosney,* 825 S.W.2d 870, 872–73 (Mo.App.1992).[22]

Appellants also urge this Court to recognize a "special duty exception" to the public duty doctrine, which would withdraw the grant of immunity in situations where the public official owes a special duty toward a specific individual. This exception has never been recognized by our courts, *id.* at 874, and appellants do not produce any facts that would entitle them to invoke the exception were we to recognize it now. The duty of MHTC and its employees to properly design and construct highways runs to the public at large. The fact that a badly designed overpass may threaten adjacent properties with flooding does not impose on them a different or higher duty toward the persons who happen to own or occupy those properties.

Similarly, appellants have not disclosed any facts that would preclude application of the official immunity doctrine in this case. Whether an act is discretionary depends on the degree of reason and judgment it requires, judged by such factors as the nature of the official's duties, the extent to which policymaking or professional expertise is involved, and the likely consequences of withholding immunity. *Kanagawa,* 685 S.W.2d at 836. Without question, the design of a highway bypass project qualifies as a discretionary function under these criteria.

We conclude that Downs is immune from liability for negligence in the design of the bypass project under both the public duty and official immunity doctrines. Accordingly, the grant of summary judgment in his favor was not in error.

## VI. *Conclusion*

The trial court's grant of judgment notwithstanding the verdict in favor of MHTC is reversed and remanded. The denial of appellants' motion for new trial also is reversed and the cause is remanded for reconsideration of this motion. In all other respects, the trial court's judgment is affirmed.

All concur.

---

**21.** The rejection of the public duty doctrine is by no means universal. *See e.g., Hines v. District of Columbia,* 580 A.2d 133, 136 (D.C.1990); *Coty v. Washoe County,* 108 Nev. 757, 839 P.2d 97, 98–99 (1992); *Bellamy v. Brown,* 305 S.C. 291, 408 S.E.2d 219, 220 (1991).

**22.** Moreover, most of the courts that have abandoned the public duty doctrine continue to protect individual public officers through the official immunity doctrine. *See, e.g., Aspen Exploration Corp. v. Sheffield,* 739 P.2d 150, 153 (Alaska 1987); *Ryan v. State,* 656 P.2d at 599; *Leake v. Cain,* 720 P.2d at 163; *Rupp v. Bryant,* 417 So.2d 658, 662 (Fla.1982), *superseded by statute, Rice v. Lee,* 477 So.2d 1009, 1010 (Fla.Dist.Ct.App.1985); *Bradford v. Davis,* 290 Or. 855, 626 P.2d 1376, 1382 (1981); *K.L. v. Hinickle,* 144 Wis.2d 102, 423 N.W.2d 528, 530 (1988).