542 So.2d 959 (1989)
WESTLAND SKATING CENTER, INC., et al., Petitioners,
v.
GUS MACHADO BUICK, INC., et al., Respondents.
No. 72492.
Supreme Court of Florida.
March 30, 1989.
Alan T. Dimond and Steven M. Goldsmith of Greenberg, Traurig, Hoffman, Lipoff, *960 Rosen & Quentel, P.A., Miami, for petitioners.
Pamela Beckham and Michael C. Spring of Carey, Dwyer, Cole, Eckhart, Mason & Spring, P.A., Miami, for respondents.
GRIMES, Justice.
We review Gus Machado Buick, Inc. v. Westland Skating Center, Inc., 523 So.2d 596 (Fla. 3d DCA 1987), because of apparent conflict with Seminole County v. Mertz, 415 So.2d 1286 (Fla. 5th DCA), review denied, 424 So.2d 763 (Fla. 1982).[1]
This case involves a dispute among occupiers of adjacent parcels of land that used to be part of the Everglades and later became pastureland, but which now comprise commercially developed property in Dade County. Petitioner, Westland Skating Center, Inc., operated a skating rink on property leased from petitioner, Hialeah Skating Center, Ltd.[2] An auto dealership, now operated by respondent, Gus Machado Buick, Inc., occupied abutting property. There has been some alteration of all the land involved, but the parties agree that the natural drainage flow was generally and gradually toward the southwest, that is from the skating rink property onto and toward the rear of the auto dealership property.[3] When the auto dealership was built in 1970, a miniature-golf course occupied the skating rink property, and apparently neither landowner had unusual problems in dealing with rainwater.
Trouble began in April 1980, however, after the construction of the skating rink. The building's roof was 200 by 120 feet. A 200-by-60-foot section sloped toward the auto dealership; it ended about 10 feet from the property line. Water drained off the roof through five downspouts. During a rainstorm the auto dealership, then Seipp Buick, experienced flooding extensive enough to damage several cars. This sort of flooding had occurred only once before, and then during much heavier rain. Seipp blamed the new skating rink, with its sloping roof and downspouts, for increasing the flow of water onto his property.
Talks between Seipp and Revitz to alleviate the problem were unavailing, and in 1980 Seipp decided to take action. He built a wall, 8 feet high and 2 feet deep between the two tracts along the 900-foot length of his property. This project took several months to complete; the skating center did not object to the presence of the wall during that time.
August of 1981 brought a heavy rain and profoundly different results than the 1980 downpour. This time, water ran off the roof and down toward Seipp's wall, which acted as a dam. The water then backed up under the skating rink's floor, inflicting heavy damage. The floor was replaced, but another heavy rain a month or so later resulted in more flooding, which the skating rink's employees alleviated by sledgehammering holes in Seipp's wall. More repairs to the rink ensued, but eventually it closed.
Westland and Hialeah sued Seipp for damages and sought a mandatory injunction to remove the wall. Seipp counterclaimed for damages and to enjoin Westland from damaging the wall. During the litigation, Machado bought the Seipp land and the dealership and was substituted as a party.[4]
Before trial, Westland and Hialeah obtained a partial summary judgment to the effect that as long as the skating rink was constructed in accordance with the South Florida Building Code, Machado's lower-elevation *961 lot remained the servienttenement for all surface water flowing from the skating center. The case proceeded to trial where the jury, after receiving an instruction that tracked the language of the partial summary judgment, found in favor of Westland and Hialeah in excess of one million dollars in damages.
The Third District Court of Appeal reversed the judgment against Machado in a six-to-three split decision. The court held that the trial judge had applied an incorrect rule of law in granting the summary judgment and that the jury instruction based on the summary judgment also was error.
Originally, disputes involving the interference of surface waters were resolved by one of two doctrines: the common enemy rule or the civil law rule. See generally F. Maloney, S. Plager, R. Ausness, B. Canter, Florida Water Law 589 (1980), [hereinafter Maloney & Plager]; Kunyon & McClure, Interference With Surface Water, 24 Minn.L.Rev. 891 (1940); Annotation, Modern Status of Rules Governing Interference With Drainage of Surface Waters, 93 A.L.R.3d 1216 (1979). The common enemy rule held that landowners had an unlimited privilege to deal with the surface water on their land as they pleased without regard to the harm which may be caused to others. The civil law rule recognized that higher elevation tracts had an easement or servitude over lower tracts for all surface water that naturally flowed downhill. However, anyone who increased or interfered with the natural flow of surface waters so as to cause invasion of another's interests was subject to liability to the other.
Neither of these doctrines, in its pure form, was perfect, especially as the population increased. While the common enemy rule permitted the free improvement of property, it also carried with it the potential of self-help engineering contests in which the winner was the person who most effectively turned the excess water upon his neighbor's land. On the other hand, the civil law rule acted as an impediment to the improvement of land since almost any development by an upper landowner was likely to increase the flow of surface water upon the land below and most efforts by the lower owner to dam the natural flow had the effect of throwing the water back onto the land of the upper owner. As a consequence, some jurisdictions adopted a third rule, known as the reasonable use rule. Under this rule, a possessor of land is not unqualifiedly entitled to deal with surface waters as he pleases nor is he absolutely prohibited from increasing or interfering with the natural flow of surface waters to the detriment of others. Each possessor is legally privileged to make reasonable use of his land even though the flow of surface waters is altered thereby and causes some harm to others. He incurs liability only when his harmful interference with the flow of surface waters is unreasonable.
Because of the inequities which would result from a strict application of either the common enemy or the civil law rule, most of the states which had adopted either of these rules began to apply modifications in given cases. Often, these hybrid rules produced the same result as would have occurred through the application of the reasonable use rule. The reasonable use rule has been adopted by Restatement (Second) of Torts § 833 (1979), which recommends that claims of interference with the flow of surface waters should be decided under principles of nuisance. See Pendergrast v. Aiken, 293 N.C. 201, 236 S.E.2d 787 (1977) (if the interference is intentional, the conduct of the offending party is measured in terms of reasonableness; if unintentional, the test is negligence).
The Florida position with respect to the interference with surface waters is not entirely clear. After explaining the common enemy and the civil law rules in Brumley v. Dorner, 78 Fla. 495, 83 So. 912 (1919), this Court noted that both of these rules had been modified considerably by the courts to the extent that each case must stand upon its own facts. The Court then stated:
The almost universal rule, as gathered from the decisions, is that no person has the right to gather surface waters that *962 would naturally flow in one direction by drainage, ditches, dams, or otherwise, and divert them from their natural course and cast them upon the lands of the lower owner to his injury.
Id. at 501, 83 So. at 914. Later in the opinion, the Court observed:
The law as to surface waters and other waters accumulated and thrown upon the lands of adjoining property, that would not naturally flow across it, is stronger than the rule against accumulating water in quantities and casting it upon the lower proprietor, which would under natural conditions receive the water from the upper proprietor, as it naturally flows upon the lower proprietor... .
Id. at 504, 83 So. at 914-15.[5]
There are several subsequent cases in which the First District Court of Appeal announced principles which appear consistent with the strict civil law rule. Koger Properties, Inc. v. Allen, 314 So.2d 792 (Fla. 1st DCA 1975), cert. denied, 328 So.2d 842 (Fla. 1976); Hodge v. Justus, 312 So.2d 248 (Fla. 1st DCA 1975); New Homes of Pensacola, Inc. v. Mayne, 169 So.2d 345 (Fla. 1st DCA 1964). On the other hand, in Seminole County v. Mertz, the court said:
Courts of Florida have applied, in an almost unbroken line of decisions, practically all the elements of the modified civil law rule of surface water. F. Maloney, S. Plager, R. Ausness, B. Canter, Florida Water Law 617 (1980) [hereinafter cited as Maloney & Plager]. The general rule today is that the upper owner may improve and enhance the natural drainage of his land as long as he acts reasonably and does not divert the flow, and that the lower owner is subject to an easement for such flow as the upper owner is allowed to cast upon him. Maloney & Plager at 592.
415 So.2d at 1289.
The majority opinion of the Third District Court of Appeal below adopted the strict civil law rule. The court reasoned that whether Westland's use of the property was reasonable was irrelevant. The court held that if Westland's improvement of the property caused an increase in the amount or a diversion of the surface water flowing onto Machado's property, Machado could not be liable to Westland for erecting the wall to protect its property. This holding directly conflicted with the foregoing statement from Mertz.
Upon analysis, we have elected to adopt the reasonable use rule in cases involving the interference with surface waters.[6] In so doing, we join approximately twenty-one other states, Case Comment, Waters and Water Courses  Torts  Owners of Property Damaged by Unlawful Ditching or Unreasonable Discharge of Waters May Obtain Relief by Statute or by the Tort Concept of Reasonable Use, 60 N.D.L.Rev. 741, 745 (1984), many of which have taken this position in recent years. E.g., Page Motor Co. v. Baker, 182 Conn. 484, 438 A.2d 739 (1980); Cootey v. Sun Inv., Inc., 690 P.2d 1324 (Haw. App.), cert. granted, 67 Haw. 685, 744 P.2d 781 (1984), rev'd in part, 718 P.2d 1086 (Haw. 1986); Hall v. Wood, 443 So.2d 834 (Miss. 1983); McGlashan v. Spade Rockledge Terrace Condo. Dev. Corp., 62 Ohio St.2d 55, 402 N.E.2d 1196 (1980); Butler v. Bruno, 115 R.I. 264, 341 A.2d 735 (1975).
The rule we announce appears much like the modified civil law rule; however, we believe it desirable to state our position through the adoption of the separate rule of reasonable use. As noted by Maloney and Plager, supra, at 596:
Although the courts have treated the doctrine of reasonable use as a separate rule on equal footing with the civil law and common enemy rules, it is in reality merely the general tort principle which would decide such cases in the absence of the application of either of the two *963 "property" rules. The relationship between adjoining landowners, in the absence of specific property rights, has always been governed by the maxim "Sicutere two [sic] ut alienum non laedas" ("Use your property in such a manner as not to injure that of another"). Much confusion and strained reasoning could be avoided if the courts would limit the application of the traditional rules to the narrowest possible situation or discard them altogether.
(Footnotes omitted.)
The principle that an upper landowner enjoys an easement across the lower tract for all naturally occurring surface water continues to apply to land in its natural state. However, when any party improves his land, thereby causing surface waters to damage his neighbor's property, the reasonable use rule shall be applied in order to settle the controversy. The rule applies not only in cases involving the conduct of the upper owner but also to improvements by the lower owner, such as the construction of dams designed to protect against the natural flow of surface waters across the lower land. See Mulder v. Tague, 85 S.D. 544, 186 N.W.2d 884 (1971). Regardless of whether a counterclaim has been filed when both parties have made improvements, the reasonableness of the conduct of each will be in issue and may be compared in order to arrive at a fair determination.
We recognize that the application of the reasonable use rule may make the outcome of certain controversies less predictable. Yet, if the rigidity of the traditional doctrines made cases predictable, it also led to such arbitrary results that the courts began to modify those rules. Predictability should not be achieved at the expense of justice. We believe that the rule of reasonable use employs the proper balance and will best enable surface water controversies to be fairly decided. As stated in McGlashan v. Spade Rockledge Terrace Condominium Development Corp.:
The basic issue in these controversies is normally whether liability for the damage resulting from an interference with surface water flow should be borne by the person causing it. In this regard, an analysis centering on the reasonableness of a defendant's conduct, in view of all the circumstances, is more likely to produce an equitable result than one based on arbitrary property concepts. It is true that the law should not inhibit reasonable land development, but neither should it allow a landowner to expel surface water without regard to the consequences. As eloquently stated by Justice Brennan in Armstrong v. Francis Corp. (1956), 20 N.J. 320, 330, 120 A.2d 4, 10, "no reason suggests itself why, in justice, the economic costs incident to the expulsion of surface waters in the transformation of the rural or semi-rural areas of our State into urban or suburban communities should be borne in every case by adjoining landowners rather than by those who engage in such projects for profit. Social progress and the common well-being are in actuality better served by a just and right balancing of the competing interests according to the general principles of fairness and common sense which attend the application of the rule of reason."
62 Ohio St.2d at 59, 402 N.E.2d at 1199-1200.
While it is evident that we do not accept the application of the strict civil law rule by the district court of appeal, we do not disagree with its analysis of the disputed jury instruction. The jury instruction read as follows:
Higher elevation land imposes a servitude on the owner of neighboring lower elevation land to accept the runoff of water naturally flowing from the higher elevation to the lower.
The owner of higher elevation land has a right to use and improve his land by constructing a building on his property in accordance with applicable building code requirements.
Where the higher elevation owner complies with the applicable building code, and rainwater then falls onto the building constructed on the higher elevation land, and from that building onto *964 the lower elevation land, a servitude on the lower elevation landowner is still imposed as it is for naturally flowing water.
The owner of lower elevation land may not lawfully construct a barrier between its land and the adjoining higher elevation land for the purpose, in whole or in part, of preventing water from flowing from the higher elevation land to the lower elevation land unless:
(a) The owner of the higher elevation land grants permission for the barrier constructed by the lower elevation landowner; or
(b) The building on the higher elevation was not constructed in accordance with applicable building code requirements which deviates from code cause the natural water flow to be increased or made more burdensome; or
(c) The barrier built by the lower landowner provides adequate drainage to protect the higher elevation landowner from flood.
This instruction had the practical effect of requiring the jury to determine the reasonableness of Westland's conduct based upon whether or not it complied with the South Florida Building Code. As noted by the court below, while one's compliance with a statute or an ordinance may amount to evidence of reasonableness, such compliance is not tantamount to reasonableness as a matter of law. Thus, evidence of Westland's compliance with the code could be properly considered as evidence of the reasonableness of its conduct, but not to the exclusion of other relevant evidence on that issue.[7] Moreover, this case involved an evaluation and comparison of the reasonableness of the conduct of both parties. Therefore, the entry of the partial summary judgment and the resultant giving of the disputed jury instruction constituted reversible error.
Accordingly, while we have expressed differing views with respect to the law applicable to the interference with surface waters, we approve the decision of the district court of appeal reversing the judgment and directing a new trial.
It is so ordered.
EHRLICH, C.J., and OVERTON, McDONALD, SHAW, BARKETT and KOGAN, JJ., concur.
NOTES
[1] Art. V, § 3(b)(3), Fla. Const.
[2] Hialeah leased the land from Revitz, who is not a party to this suit.
[3] The only evidence at trial of this "natural" flow was from a surveyor, who based his conclusions on a 1961 survey which was done before the area was commercially developed. Apparently, there was no survey of the land while it was actually the Everglades. The surveyor said the average slope was about 1 inch every 30 feet, and that some of the land sloped to the south, rather than the southwest.
[4] The counterclaim was dismissed in return for Westland and Hialeah agreeing not to seek punitive damages. The record is silent as to the fate of the injunction, but apparently improvements to both lots eliminated the flooding and mooted the issue.
[5] The latter statement suggests that part of the confusion in this area of the law results from the failure to differentiate between conduct which diverts and redirects the flow of surface water and that which merely increases the natural flow.
[6] This Court has previously recognized that subject to legislative regulation, the reasonable use rule is applicable to subsurface waters. Village of Tequesta v. Jupiter Inlet Corp., 371 So.2d 663 (Fla.), cert. denied, 444 U.S. 965, 100 S.Ct. 453, 62 L.Ed.2d 377 (1979).
[7] The persuasiveness of Westland's compliance with the code may depend, in part, upon the extent to which the code seeks to protect others from being damaged by surface waters caused through the construction of the approved project.