6 So.3d 717 (2009)
Cozette R. DRAKE, as successor trustee, to the William R. Hemby Revocable Trust and the Hemby Unified Credit Shelter Trust, as successor personal representative of the Estate of William R. Hemby, and as successor trustee of the Patricia S. Hemby Revocable Trust, Appellant,
v.
WALTON COUNTY, a political subdivision of the State of Florida, Appellee.
No. 1D07-3202.
District Court of Appeal of Florida, First District.
April 14, 2009.
*718 J. Stanley Chapman, Tallahassee, for Appellant.
Bill McCollum, Attorney General, Tallahassee; and Gregory T. Stewart, Harry F. Chiles, and Carly J. Schrader of Nabors, Giblin & Nickerson, P.A., Tallahassee, for Appellee.

OPINION ON MOTION FOR REHEARING EN BANC, MOTION FOR REHEARING, MOTION FOR CLARIFICATION, AND MOTION FOR CERTIFICATION
THOMAS, J.
This cause is before us on Appellee's motion for rehearing en banc, motion for rehearing, motion for clarification, and motion for certification. We deny the motion for rehearing en banc, rehearing, and certification, and grant only to clarify the two separate takings. Accordingly, we withdraw our former opinion of November 21, 2008, and substitute in its place this corrected opinion.
*719 Appellant, as successor in interest to the original plaintiffs below,[1] appeals a final judgment entered in favor of Appellee Walton County (County). We affirm the final judgment on all claims except Appellant's inverse condemnation claims, which require us to consider whether the County engaged in a taking of private property when it diverted water across Appellant's property and allowed the water diversion to continue after an emergency passed. We hold as a matter of law that the County's action constitutes a taking of Appellant's private property for a public purpose and that her claim is not precluded by section 252.43(6), Florida Statutes. Accordingly, we reverse and remand for the court to enter a final judgment in favor of Appellant on her inverse condemnation claim.

Facts and Procedural History
William and Patricia Hemby purchased the subject property in 1992. The upper portion of this property had previously experienced water overflow from an outflow of Oyster Lake, and the water eventually flowed into the Gulf of Mexico. This previous water flow was stabilized in 1988 with the assistance of state authorities. Between 1988 and 1995, no water crossed the upper portion of Appellant's property, thus making the upper portion of the land available for development. It was during this time that Appellants purchased the subject property.
In 1995, following Hurricane Opal, the County reconfigured the drainage from the outflow and diverted water through the upper portion of Appellant's property. This action was taken to alleviate flooding of other property caused by rising water in Oyster Lake when the outflow culverts became blocked. After this reconfiguration, from 1996 through 1999, the County cooperated with Appellant to help redirect the flow away from the subject property and restore the water flow to pre-Opal conditions; however, these efforts were unsuccessful. In 2004, the County successfully redirected the water flow away from Appellant's property, but in 2005, at least once under emergency conditions, the County diverted the water flow across the upper portion of the subject property in order to protect a neighbor's home and property. This water diversion remains in place.
The County acknowledges that it diverted water across the upper portion of Appellant's property in 1995 and 2005, primarily to save other private property, but asserts that this water diversion simply restored the natural processes in existence before the Hembys purchased the property in 1992.
A bench trial was conducted on Appellant's two claims of inverse condemnation for the periods of 1996 through 2004, and 2005 onward, and final judgment was entered for the County. The trial court ruled in part that diverting the water could not constitute a taking because the County's reconfiguration followed declared emergencies under section 252.43(6), Florida Statutes. The trial court found that this reconfiguration simply restored the natural drainage pattern from Oyster Lake that predated any artificial structures or drainage improvements, and concluded that Appellant could not rely on the drainage patterns established in 1988 and *720 assume the property could be used for development. Thus, the trial court concluded that the Hembys did not engage in due diligence before buying the property; therefore, because the County only responded to emergency conditions by restoring the outflow and allowing Oyster Lake to drain, and this drainage was a natural occurrence, the County did not legally take Appellant's property.

Analysis
We review the trial courts factual findings to determine whether they are supported by competent, substantial evidence. When they are not, it is the duty of the appellate court to reverse. See Beaty v. Miller, 480 So.2d 196, 197 (Fla. 1st DCA 1985). We review the court's legal conclusions de novo. See S. Baptist Hosp. of Fla., Inc. v. Welker, 908 So.2d 317, 319-20 (Fla.2005).
The critical undisputed fact in this case is that before the Hembys purchased the subject property in 1988, the ditch draining the Oyster Lake outflow was stabilized and did not discharge water across the upper portion of the property. This ditch was permitted by the Department of Environmental Regulation as part of a ditch relocation and stabilization project. This drainage was not changed until the County acted in 1995 to alleviate flooding caused when the Oyster Lake outflow was clogged after Hurricane Opal. While the County's actions in clearing the culvert to alleviate flooding of other property may have been prudent and commendable, and authorized by statute, the fact remains that the County acted in a manner that caused flooding on Appellant's property. Hurricane Opal did not flood Appellant's property; it was the County's action in response to the hurricane that caused the flooding. This case would be in a completely different posture had Appellant's property been flooded by the hurricane itself, without the County's intervention.
The trial court's findings that Oyster Lake previously discharged water onto Appellant's property "for centuries" is not, in our view, legally relevant. The relevant fact is that the Hembys could reasonably rely on the drainage pattern established by the drainage stabilization in 1988, and when the County reconfigured that drainage pattern, it resulted in a taking. Schick v. Fla. Dep't of Agric., 504 So.2d 1318 (Fla. 1st DCA 1987), rev. denied, Dep't of Agric. v. Schick, 513 So.2d 1060 (Fla.1987). Government cannot choose to act and protect one property owner by diverting floodwater onto the property of another without compensating that property owner. Although Appellant's property may have flooded in the distant past, such flooding was eliminated in 1988.
We have previously held that a county takes private property when it directs a concentrated flow of water from one property onto another, permanently depriving the owner of all beneficial enjoyment of their property. Leon County v. Smith, 397 So.2d 362, 364 (Fla. 1st DCA 1981); Martin v. City of Monticello, 632 So.2d 236, 237 (Fla. 1st DCA 1994). To assert an inverse condemnation claim based on such governmental action, the property owner must demonstrate that the government's action constitutes a substantial interference with her private property rights for more than a momentary period, and will be continuous or reasonably expected to continuously recur, resulting in a substantial deprivation of the beneficial use of her property. See Elliott v. Hernando County, 281 So.2d 395, 396 (Fla. 2d DCA 1973) (noting that "rain is a condition that is reasonably expected to continually re-occur in the future)"; Assoc. of Meadow Lake, Inc. v. City of Edgewater, 706 So.2d 50 (Fla. 5th DCA 1998); cf. Diamond K *721 Corp. v. Leon County, 677 So.2d 90 (Fla. 1st DCA 1996) (holding that no taking occurred as a result of flooding of a creek in the appellant's property because the appellant had not shown that a continuing physical invasion occurred, depriving it of all reasonable use of its property). A taking is more likely to have occurred when a governmental action confers a public benefit rather than prevents a public harm. Graham v. Estuary Properties, Inc., 399 So.2d 1374, 1381 (Fla.1981).
In developing her property, Appellant does not seek to change its natural environmental conditions, but rather seeks to protect it from the County's water flow diversion. The County admits that it diverted water across Appellant's property, and the undisputed testimony establishes that the ditch the County constructed caused water to divert and flow onto Appellant's property. The County allowed the ditch that it created during emergency conditions to remain as a drainage easement on Appellant's property long after the emergency passed. We find that the County's reconfiguration conferred a public benefit on other property owners rather than prevented a public harm. We hold that this constitutes a taking.
Based on these undisputed facts, the court's legal conclusion that "there has been neither a continuing physical invasion of the property nor a substantial deprivation of all beneficial use" is not supported by competent, substantial evidence. As in Smith, the water diversion here is a permanent or continuous physical invasion of Appellant's property, rendering it useless and permanently depriving Appellant of the beneficial enjoyment of her property.
We assume arguendo that the County's reconfigurations in 1995 and 2005 were authorized pursuant to section 252.43(6).[2] Further, Appellant concedes that the County's actions constituted a proper public purpose, arguing only that regardless of the legitimacy of the County's actions in diverting water across her property under its police power, she is entitled to compensation for the taking and that the County does not enjoy statutory immunity during an emergency. See Art. X, § 6, Fla. Const. ("No private property shall be taken except for a public purpose and with full compensation therefor paid to each owner[.]"); Wilton v. St. Johns County, 98 Fla. 26, 123 So. 527, 533-34 (1929) (explaining that the power of eminent domain can be exercised only for a valid public purpose).
We agree with Appellant and hold that section 252.43(6) does not grant the County immunity during an emergency and thus preclude Appellant, as an innocent property owner, from initiating a takings claim. See Storer Cable T.V. of Fla., Inc. v. Summerwinds Apartments Assocs., Ltd., 493 So.2d 417, 418 (Fla.1986) (holding that a statute authorizing television service providers to enter private property without compensation to owners is unconstitutional). Regardless of the County's statutory right to excavate drainage paths to preserve property under section 252.43(6), the Florida Constitution requires compensation for an adversely affected owner. See Art. X, § 6, Fla. Const.; Notami Hosp. of Fla., Inc. v. Bowen, 927 So.2d *722 139, 142 (Fla. 1st DCA 2006) ("State constitutions are limitations upon the power of state legislatures. Consequently, a statute enacted by the Legislature may not restrict a right granted under the Constitution.") (citations omitted), aff'd, 984 So.2d 478 (Fla.2008). Thus, the County's statutory authority under section 252.43(6), Florida Statutes, must yield to Article 10, section 6 of the Florida Constitution, which requires the County to compensate Appellant.
We find that Appellant's claims are not precluded by section 252.43(6), Florida Statutes, and that two takings occurred when the County diverted water across Appellant's property  the first taking occurred during the period of 1995 through 2004, and the second from 2005 to the present date. We therefore reverse the final judgment and remand with directions to enter judgment for Appellant on her inverse condemnation claims and to determine the value of the taking. All other issues raised by Appellant are affirmed.
AFFIRMED in part, REVERSED in part, and REMANDED.
BROWNING, J., concurs; BARFIELD, J., dissents with written opinion.
BARFIELD, J., dissenting.
The majority's opinion, reversing the trial court's ruling against the plaintiff on her inverse condemnation claims, relies in part on this Court's earlier opinion in Leon County v. Smith, 397 So.2d 362 (Fla. 1st DCA 1981). In that case, this Court found that there was no record evidence to support Leon County's argument that Smith's property was a natural drainage basin. However, in the case at issue, the record is replete with undisputed evidence that the plaintiff's property is the natural drainage basin for Oyster Lake, a coastal dune lake located north of County Road 30A in Walton County. The record also contains substantial and undisputed evidence that the path of the natural flow of water from Oyster Lake (the outfall) has historically meandered across the entire subject property. The trial court's findings with regard to these facts are supported by the record and therefore must be affirmed.
The subject property, three beachfront lots on the Gulf of Mexico south of County Road 30A, had been donated to the Florida State University Foundation by developers. The Foundation was unable to sell the undeveloped beachfront lots because prospective purchasers wanted assurances that development would not be precluded by the Oyster Lake outfall. In 1984, the plaintiff's predecessors in interest purchased the adjacent lot east of the subject property, which included an existing beach house.
In the late 1980s, the then existing channel for the outfall from Oyster Lake became blocked, causing flooding of the subject property by the outfall and threatening the boardwalk and septic tank on the adjacent property owned by the plaintiff's predecessors in interest. With the Foundation's power of attorney, the plaintiff's predecessors in interest attempted to divert the Oyster Lake outfall away from their property by having a trench dug for the outfall near the western edge of the subject property, but the first attempt failed within six months. In 1988, the Florida Department of Environmental Regulation allowed the plaintiff's predecessors in interest to deepen the trench near the western edge of the subject property. In 1992, the plaintiff's predecessors in interest purchased the Foundation's three beachfront lots for a total price of $50,000 (i.e., each of the beachfront lots subject to the Oyster Lake Outfall cost the plaintiff's predecessors in interest a mere $16,666.67).
*723 The fact that the plaintiff's predecessors in interest were allowed to divert the natural flow of the outfall from Oyster Lake to a drainage trench which they constructed along the edge of the subject property, in order to protect their beach house on the adjacent lot, does not change the fact that the subject property is the natural drainage basin for Oyster Lake, of which the plaintiff's predecessors in interest were well aware prior to their 1992 purchase of the property.
In 1995, due to Hurricane Opal, the box culvert under County Road 30A was completely filled with sand, blocking the natural outfall from Oyster Lake. Walton County cleared the culvert to relieve the flooding of the Oyster Lake area, and once the culvert was cleared, the water pressure and topography caused the Oyster Lake outfall to take a path different from the trench which had been constructed by the plaintiff's predecessors in interest in 1988. It is clear that under the well-settled law pertaining to inverse condemnation and to interference with the natural flow of surface waters, the actions of the County after Hurricane Opal in clearing the blockage of the natural flow of water from Oyster Lake and restoring its natural outfall was reasonable and did not constitute a "taking" of the subject property, nor of any portion thereof, by inverse condemnation. I find no record evidence to support the majority's "findings," contrary to the factual findings of the trial court, that "following Hurricane Opal, the County reconfigured the drainage from the outflow and diverted water through the upper portion of Appellant's property" (emphasis added) and that it was the County's actions in response to Hurricane Opal, not the hurricane itself, which "caused flooding on Appellant's property."
During the ensuing years, Walton County cooperated with the plaintiff's predecessors in interest in their attempts to rechannel the Oyster Lake outfall to its pre-Hurricane Opal location along the western edge of the subject property and to stabilize to some extent the drainage trench that had been dug in 1988. However, both state and local officials found unacceptable and denied the request by the plaintiff's predecessors in interest for the placement of concrete slabs along the trench to permanently redirect and reinforce the outfall channel along the edge of the subject property. In September 2001, Walton County informed the state permitting authorities that it viewed the Oyster Lake outfall trench project proposed by the plaintiff's predecessors in interest as contrary to the Walton County Comprehensive Plan. These facts and subsequent events demonstrate that the Oyster Lake outfall mitigation attempts did not and were not intended to permanently restrict the outfall from ever again flowing across the subject property, as it had done for at least two centuries according to the undisputed expert opinion testimony.
In November 2002, the plaintiff's predecessors in interest turned their attention to improving the existing beach house on their original lot, and sought a permit to expand its size. Walton County approved the permit, but required the plaintiff's predecessors in interest to combine the original lot with the easternmost of the three lots purchased in 1992 from the Foundation in order to comply with the County's Comprehensive Plan.
However, in August 2002, the plaintiff's predecessors in interest had filed suit against Walton County, claiming inverse condemnation, trespass, and negligence based upon the clearing of the box culvert following Hurricane Opal and other storms. While the case was pending, Walton County announced plans to build an open-span bridge to replace the box culvert *724 through which the Oyster Lake outfall flows under the road, and the plaintiff's predecessors in interest responded by seeking a temporary injunction to stop the proposed construction.
Just before the 2004 hearing on the injunction request, Hurricane Ivan struck the area, filling the box culvert with debris and blocking the Oyster Lake outfall. Walton County obtained an emergency permit to clear the culvert and to channel the outfall west along the road right-of-way to the western boundary of the subject property, then south along the western property line to the Gulf of Mexico. The plaintiff's predecessors in interest obtained a temporary permit to place sandbags in front of the culvert to reinforce the flow of water west along the road right-of-way. The majority characterizes the actions of the County after Hurricane Ivan as having "successfully redirected the water flow away from Appellant's property," but it does not explain its apparent conclusion that this attempt by the County to mitigate the effects of the natural outfall from Oyster Lake on the subject property could somehow give the plaintiff's predecessors in interest the right to claim a taking by inverse condemnation if such mitigation attempts were subsequently to fail or to become untenable.
In April 2005, heavy storm water flow caused erosion along the western side of the outfall trench, flooding the adjacent property west of the subject property and threatening the beach house on that adjacent property. Walton County replaced the sand under that beach house and temporarily "hardened" the western bank of the outfall trench with sandbags, which were removed after one week.
In July 2005, Hurricane Dennis struck the area, filling the box culvert and outfall channel with sand and debris, thereby causing flooding around Oyster Lake. The County cleared the culvert and the channel along the road right-of-way, but angled the channel diagonally across the northwest corner of the subject property to avoid destruction of the adjacent beach house which had been threatened in April 2005. In August 2005, Hurricane Katrina struck the area, again filling the box culvert and channel with sand and debris. The County again cleared the culvert and the channel along the road right-of-way, and again angled the channel diagonally across the northwest corner of the subject property to avoid destruction of the adjacent beach house which had been threatened in April 2005.
In February 2006, the plaintiff's predecessors in interest amended their complaint against Walton County to allege separate claims of inverse condemnation, alleging a temporary taking of their property from 1995 to 2004, and takings of their property after Hurricanes Dennis and Katrina in 2005, along with claims for "condemnation blight," trespass, and negligence. They sought damages and injunctive relief, including a mandatory injunction requiring Walton County to remove the so-called "artificial watercourse" from their property and to construct appropriate drainage facilities upstream and adjacent to their property, and an injunction against all other development which would contribute to the storm water flow across their property. After a bench trial, the trial court found for Walton County on each of the claims.
In its former opinion of November 21, 2008, the majority appeared to affirm the final judgment for Walton County on all the claims except the inverse condemnation claims relating to the alleged 2005 "takings" based on Walton County's having "diverted" water diagonally across the subject property and having "allowed the water diversion to continue after an emergency *725 passed." At the time, I read the majority's opinion as having implicitly rejected the claims of inverse condemnation related to the County's repeated clearings of the box culvert prior to the 2005 alleged "diversion" of waters diagonally across the northwest corner of the subject property. This led to the inescapable conclusion that, had the County merely cleared the box culvert and allowed the Oyster Lake outfall to flow unimpeded to the Gulf of Mexico in 2005, as it had previously done after Hurricane Opal and other storms, the majority would have been forced to find that all inverse condemnation claims of the plaintiff's predecessors in interest would properly have been denied.
The majority's subsequent substituted opinion merely adds language to the last paragraph clarifying its holding that "two takings" occurred, one "during the period 1995-2004" and another "from 2005 to the present day." Earlier in the opinion, the majority noted that, "[t]his case would be in a completely different posture had Appellant's property been flooded by [Hurricane Opal] itself, without the County's intervention," and that the subsequent cooperative efforts of the County and the plaintiff's predecessors in interest "to help direct the flow away from the subject property and restore the water flow to pre-Opal conditions" were "unsuccessful." However, neither the original opinion nor the substituted opinion explains how Walton County's actions between 1995 and 2004 in clearing the box culvert of debris caused by hurricanes and storms somehow resulted in a "taking" of the subject property.
In 2005, instead of allowing the outfall from Oyster Lake to flow naturally across the subject property, as it has historically done, Walton County attempted to mitigate the effects of the outfall by channeling it across the corner and along the edge of the subject property, in an attempt to protect both the property owned by the plaintiff's predecessors in interest and the beach house of the adjacent property owner. It should be noted that the beach house of the adjacent property owner would in all likelihood not have been threatened if the County had allowed the outfall to flow naturally across the subject property, as it has done for as long as such things have been recorded. To allow the plaintiff to recover damages from Walton County based on its actions in attempting to mitigate the effects of the natural flow of water from the coastal dune lake on both properties is, in my opinion, a travesty of justice and a clear departure from well-settled law.
The majority opinion appears to hold that a servient tenement, which has been subject to the natural flow of surface water from the dominant tenement for centuries, can divert the natural flow of surface water from the dominant tenement into an artificial channel and thereafter require the dominant tenement to permanently maintain this artificial flow of surface water. This apparent holding is in direct conflict with Westland Skating Center, Inc. v. Gus Machado Buick, Inc., 542 So.2d 959, 961 (Fla.1989), in which the supreme court adopted the "reasonable use" rule for cases involving surface waters:
Under this rule, a possessor of land is not unqualifiedly entitled to deal with surface waters as he pleases[,] nor is he absolutely prohibited from increasing or interfering with the natural flow of surface waters to the detriment of others. Each possessor is legally privileged to make reasonable use of his land even though the flow of surface waters is altered thereby and causes some harm to others. He incurs liability only when *726 his harmful interference with the flow of surface waters is unreasonable.
The majority attempts to support its holding, that the plaintiff's predecessors in interest "could reasonably rely on the drainage pattern established by the drainage stabilization in 1988, and when the County reconfigured that drainage pattern, it resulted in a taking," by citing Schick v. Florida Dept. of Agriculture, 504 So.2d 1318 (Fla. 1st DCA), review denied, Dept. of Agriculture v. Schick, 513 So.2d 1060 (Fla.1987). However, the holding in Schick was that a complaint alleging the state had contaminated the underground water supply with now-banned pesticide, rendering the land unusable, stated a cause of action for inverse condemnation. I fail to see how that holding supports the majority's apparent holding that the plaintiff and her predecessors in interest had the right to divert the natural flow of surface water from Oyster Lake and then to hold Walton County liable for attempting to restore the natural flow of surface water while attempting to mitigate the effects of the outfall on the subject property and on adjacent property.
It is further troubling that the majority opinion does not inform the parties and the trial judge what portion of the subject property has been "taken" by inverse condemnation. The legal description in the complaint encompasses the three water-front lots measuring 150 feet on the Gulf of Mexico purchased by the plaintiff's predecessors in interest from Florida State University Foundation. It is clear from the facts presented below that at present, the Oyster Lake outfall has been redirected so that instead of flowing freely across all of the subject property, as it has done for thousands of years, it now flows diagonally across a portion of the northwest corner of the subject property and thence along the western border of the property. The evidence does not support a finding that this has resulted in the plaintiff's loss of all beneficial use of all three of the lots comprising the original subject property, or even in her loss of all beneficial use of the westernmost of the three lots purchased from the Foundation in 1992. The evidence does demonstrate that the easternmost of the three lots has been combined with the original lot and beach house purchased by the plaintiff's predecessors in interest in 1984, and that it is being used as a residence.
The majority opinion dismisses as "not legally relevant" the uncontroverted fact that all of the property at issue has been subject to the natural flow of surface water from the outfall of Oyster Lake for centuries. There is no justification for the majority's substituting its findings of fact for the factual findings of the trial court which were supported by competent substantial evidence, and there is absolutely no legal or record support for the majority's holding, which is in direct conflict with well-settled Florida law. I would affirm the trial courts judgment in all respect.
NOTES
[1] William R. Hemby and Patricia Hemby sued Walton County in 2002 for inverse condemnation, trespass and negligence. Mr. Hemby died in November 2006, and his estate's interest in the suit was transferred to the William R. Hemby Revocable Trust, with Mrs. Hemby as trustee. Mrs. Hemby died while this appeal was pending, and her estate's interest in the suit was transferred to the Patricia S. Hemby Revocable Trust, with her daughter, Cozette R. Drake, as successor trustee of both trusts. Appellant is Ms. Drake.
[2] Section 252.43(6), Florida Statutes, states:

(6) Nothing in this section applies to or authorizes compensation for the destruction or damaging of standing timber or other property in order to provide a firebreak or damage resulting from the release of waters or the breach of impoundments in order to reduce pressure or other danger from actual or threatened flood or applies to or authorizes compensation beyond the extent of funds available for such compensation.