BARFIELD, J.,
dissenting.
The majority’s opinion, reversing the trial court’s ruling against the plaintiff on her inverse condemnation claims, relies in part on this Court’s earlier opinion in Leon County v. Smith, 397 So.2d 362 (Fla. 1st DCA 1981). In that case, this Court found that there was no record evidence to support Leon County’s ai'gument that Smith’s property was a natural drainage basin. However, in the case at issue, the record is replete with undisputed evidence that the plaintiffs property is the natural drainage basin for Oyster Lake, a coastal dune lake located north of County Road 30A in Walton County. The record also contains substantial and undisputed evidence that the path of the natural flow of water from Oyster Lake (the outfall) has historically meandered across the entire subject property. The trial court’s findings with regard to these facts are supported by the record and therefore must be affirmed.
The subject property, three beachfront lots on the Gulf of Mexico south of County Road 30A, had been donated to the Florida State University Foundation by developers. The Foundation was unable to sell the undeveloped beachfront lots because prospective purchasers wanted assurances that development would not be precluded by the Oyster Lake outfall. In 1984, the plaintiffs predecessors in interest purchased the adjacent lot east of the subject property, which included an existing beach house.
In the late 1980s, the then existing channel for the outfall from Oyster Lake became blocked, causing flooding of the subject property by the outfall and threatening the boardwalk and septic tank on the adjacent property owned by the plaintiffs predecessors in interest. With the Foundation’s power of attorney, the plaintiffs predecessors in interest attempted to divert the Oyster Lake outfall away from their property by having a trench dug for the outfall near the western edge of the subject property, but the first attempt failed within six months. In 1988, the Florida Department of Environmental Regulation allowed the plaintiffs predecessors in interest to deepen the trench near the western edge of the subject property. In 1992, the plaintiffs predecessors in interest purchased the Foundation’s three beachfront lots for a total price of $50,000 (i.e., each of the beachfront lots subject to the Oyster Lake Outfall cost the plaintiffs predecessors in interest a mere $16,666.67).
*723 The fact that the plaintiffs predecessors in interest were allowed to divert the natural flow of the outfall from Oyster Lake to a drainage trench which they constructed along the edge of the subject property, in order to protect their beach house on the adjacent lot, does not change the fact that the subject property is the natural drainage basin for Oyster Lake, of which the plaintiffs predecessors in interest were well aware prior to their 1992 purchase of the property.
In 1995, due to Hurricane Opal, the box culvert under County Road 30A was completely filled with sand, blocking the natural outfall from Oyster Lake. Walton County cleared the culvert to relieve the flooding of the Oyster Lake area, and once the culvert was cleared, the water pressure and topography caused the Oyster Lake outfall to take a path different from the trench which had been constructed by the plaintiffs predecessors in interest in 1988. It is clear that under the well-settled law pertaining to inverse condemnation and to interference with the natural flow of surface waters, the actions of the County after Hurricane Opal in clearing the blockage of the natural flow of water from Oyster Lake and restoring its natural outfall was reasonable and did not constitute a “taking” of the subject property, nor of any portion thereof, by inverse condemnation. I find no record evidence to support the majority’s “findings,” contrary to the factual findings of the trial court, that “following Hurricane Opal, the County reconfigured the drainage from the outflow and diverted water through the topper portion of Appellant’s property ” (emphasis added) and that it was the County’s actions in response to Hurricane Opal, not the hurricane itself, which “caused flooding on Appellant’s property.”
During the ensuing years, Walton County cooperated with the plaintiffs predecessors in interest in their attempts to re-channel the Oyster Lake outfall to its pre-Hurricane Opal location along the western edge of the subject property and to stabilize to some extent the drainage trench that had been dug in 1988. However, both state and local officials found unacceptable and denied the request by the plaintiffs predecessors in interest for the placement of concrete slabs along the trench to permanently redirect and reinforce the outfall channel along the edge of the subject property. In September 2001, Walton County informed the state permitting authorities that it viewed the Oyster Lake outfall trench project proposed by the plaintiffs predecessors in interest as contrary to the Walton County Comprehensive Plan. These facts and subsequent events demonstrate that the Oyster Lake outfall mitigation attempts did not and were not intended to permanently restrict the outfall from ever again flowing across the subject property, as it had done for at least two centuries according to the undisputed expert opinion testimony.
In November 2002, the plaintiffs predecessors in interest turned them attention to improving the existing beach house on their original lot, and sought a permit to expand its size. Walton County approved the permit, but required the plaintiffs predecessors in interest to combine the original lot with the easternmost of the three lots purchased in 1992 from the Foundation in order to comply with the County’s Comprehensive Plan.
However, in August 2002, the plaintiffs predecessors in interest had filed suit against Walton County, claiming inverse condemnation, trespass, and negligence based upon the clearing of the box culvert following Hurricane Opal and other storms. While the case was pending, Walton County announced plans to build an open-span bridge to replace the box cul *724 vert through which the Oyster Lake outfall flows under the road, and the plaintiffs predecessors in interest responded by seeking a temporary injunction to stop the proposed construction.
Just before the 2004 hearing on the injunction request, Hurricane Ivan struck the area, filling the box culvert with debris and blocking the Oyster Lake outfall. Walton County obtained an emergency permit to clear the culvert and to channel the outfall west along the road right-of-way to the western boundary of the subject property, then south along the western property line to the Gulf of Mexico. The plaintiffs predecessors in interest obtained a temporary permit to place sandbags in front of the culvert to reinforce the flow of water west along the road right-of-way. The majority characterizes the actions of the County after Hurricane Ivan as having “successfully redirected the water flow away from Appellant’s property,” but it does not explain its apparent conclusion that this attempt by the County to mitigate the effects of the natural outfall from Oyster Lake on the subject property could somehow give the plaintiffs predecessors in interest the right to claim a taking by inverse condemnation if such mitigation attempts were subsequently to fail or to become untenable.
In April 2005, heavy storm water flow caused erosion along the western side of the outfall trench, flooding the adjacent property west of the subject property and threatening the beach house on that adjacent property. Walton County replaced the sand under that beach house and temporarily “hardened” the western bank of the outfall trench with sandbags, which were removed after one week.
In July 2005, Hurricane Dennis struck the area, filling the box culvert and outfall channel with sand and debris, thereby causing flooding around Oyster Lake. The County cleared the culvert and the channel along the road right-of-way, but angled the channel diagonally across the northwest corner of the subject property to avoid destruction of the adjacent beach house which had been threatened in April 2005. In August 2005, Hurricane Katrina struck the area, again filling the box culvert and channel with sand and debris. The County again cleared the culvert and the channel along the road right-of-way, and again angled the channel diagonally across the northwest corner of the subject property to avoid destruction of the adjacent beach house which had been threatened in April 2005.
In February 2006, the plaintiffs predecessors in interest amended their complaint against Walton County to allege separate claims of inverse condemnation, alleging a temporary taking of their property from 1995 to 2004, and takings of their property after Hurricanes Dennis and Katrina in 2005, along with claims for “condemnation blight,” trespass, and negligence. They sought damages and injunc-tive relief, including a mandatory injunction requiring Walton County to remove the so-called “artificial watercourse” from them property and to construct appropriate drainage facilities upstream and adjacent to their property, and an injunction against all other development which would contribute to the storm water flow across them property. After a bench trial, the trial court found for Walton County on each of the claims.
In its former opinion of November 21, 2008, the majority appeared to affirm the final judgment for Walton County on all the claims except the inverse condemnation claims relating to the alleged 2005 “takings” based on Walton County’s having “diverted” water diagonally across the subject property and having “allowed the water diversion to continue after an emer *725 gency passed.” At the time, I read the majority’s opinion as having implicitly rejected the claims of inverse condemnation related to the County’s repeated clearings of the box culvert prior to the 2005 alleged “diversion” of waters diagonally across the northwest corner of the subject property. This led to the inescapable conclusion that, had the County merely cleared the box culvert and allowed the Oyster Lake outfall to flow unimpeded to the Gulf of Mexico in 2005, as it had previously done after Hurricane Opal and other storms, the majority would have been forced to find that all inverse condemnation claims of the plaintiffs predecessors in interest would properly have been denied.
The majority’s subsequent substituted opinion merely adds language to the last paragraph clarifying its holding that “two takings” occurred, one “during the period 1995-2004” and another “from 2005 to the present day.” Earlier in the opinion, the majority noted that, “[t]his case would be in a completely different posture had Appellant’s property been flooded by [Hurricane Opal] itself, without the County’s intervention,” and that the subsequent cooperative efforts of the County and the plaintiffs predecessors in interest “to help direct the flow away from the subject property and restore the water flow to pre-Opal conditions” were “unsuccessful.” However, neither the original opinion nor the substituted opinion explains how Walton County’s actions between 1995 and 2004 in clearing the box culvert of debris caused by hurricanes and storms somehow resulted in a “taking” of the subject property.
In 2005, instead of allowing the outfall from Oyster Lake to flow naturally across the subject property, as it has historically done, Walton County attempted to mitigate the effects of the outfall by channeling it across the corner and along the edge of the subject property, in an attempt to protect both the property owned by the plaintiffs predecessors in interest and the beach house of the adjacent property owner. It should be noted that the beach house of the adjacent property owner would in all likelihood not have been threatened if the County had allowed the outfall to flow naturally across the subject property, as it has done for as long as such things have been recorded. To allow the plaintiff to recover damages from Walton County based on its actions in attempting to mitigate the effects of the natural flow of water from the coastal dune lake on both properties is, in my opinion, a travesty of justice and a clear departure from well-settled law.
The majority opinion appears to hold that a servient tenement, which has been subject to the natural flow of surface water from the dominant tenement for centuries, can divert the natural flow of surface water from the dominant tenement into an artificial channel and thereafter require the dominant tenement to permanently maintain this artificial flow of surface water. This apparent holding is in direct conflict with Westland Skating Center, Inc. v. Gus Machado Buick, Inc., 542 So.2d 959, 961 (Fla.1989), in which the supreme court adopted the “reasonable use” rule for cases involving surface waters:
Under this rule, a possessor of land is not unqualifiedly entitled to deal with surface waters as he pleases[,] nor is he absolutely prohibited from increasing or interfering with the natural flow of surface waters to the detriment of others. Each possessor is legally privileged to make reasonable use of his land even though the flow of surface waters is altered thereby and causes some harm to others. He incurs liability only when *726 his harmful interference with the flow of surface waters is unreasonable.
The majority attempts to support its holding, that the plaintiffs predecessors in interest “could reasonably rely on the drainage pattern established by the drainage stabilization in 1988, and when the County reconfigured that drainage pattern, it resulted in a taking,” by citing Schick v. Florida Dept. of Agriculture, 504 So.2d 1318 (Fla. 1st DCA), review denied, Dept. of Agriculture v. Schick, 513 So.2d 1060 (Fla.1987). However, the holding in Schick was that a complaint alleging the state had contaminated the underground water supply with now-banned pesticide, rendering the land unusable, stated a cause of action for inverse condemnation. I fail to see how that holding supports the majority’s apparent holding that the plaintiff and her predecessors in interest had the right to divert the natural flow of surface water from Oyster Lake and then to hold Walton County liable for attempting to restore the natural flow of surface water while attempting to mitigate the effects of the outfall on the subject property and on adjacent property.
It is further troubling that the majority opinion does not inform the parties and the trial judge what portion of the subject property has been “taken” by inverse condemnation. The legal description in the complaint encompasses the three waterfront lots measuring 150 feet on the Gulf of Mexico purchased by the plaintiffs predecessors in interest from Florida State University Foundation. It is clear from the facts presented below that at present, the Oyster Lake outfall has been redirected so that instead of flowing freely across all of the subject property, as it has done for thousands of years, it now flows diagonally across a portion of the northwest corner of the subject property and thence along the western border of the property. The evidence does not support a finding that this has resulted in the plaintiffs loss of all beneficial use of all three of the lots comprising the original subject property, or even in her loss of all beneficial use of the westernmost of the three lots purchased from the Foundation in 1992. The evidence does demonstrate that the easternmost of the three lots has been combined with the original lot and beach house purchased by the plaintiffs predecessors in interest in 1984, and that it is being used as a residence.
The majority opinion dismisses as “not legally relevant” the uncontroverted fact that all of the property at issue has been subject to the natural flow of surface water from the outfall of Oyster Lake for centuries. There is no justification for the majority’s substituting its findings of fact for the factual findings of the trial court which were supported by competent substantial evidence, and there is absolutely no legal or record support for the majority’s holding, which is in direct conflict with well-settled Florida law. I would affirm the trial courts judgment in all respect.