JACOBS *v.* SHELTON.

4-6855                                                165 S. W. 2d 262

Opinion delivered November 2, 1942.

*Barney & Quinn,* for appellant.

*G. T. Whatley, Searcy & Searcy* and *Steel & Edwardes,* for appellee.

GRIFFIN SMITH, C. J. Appellants question correctness of a decree finding that J. T. Shelton and E. B. Taylor [1] were owners of 64.86 acres in Lafayette and Miller counties lying west and northwest of a fence constructed by Shelton in 1928.

In 1938 P. M. Allen claimed and fenced the property, whereupon suit in ejectment was brought by Shelton and Taylor in Lafayette county against Raymond A. Jacobs, Mrs. M. A. Jacobs, Mrs. Gertrude Jacobs Meleton, and P. M. Allen. [2]

Although in 1924 J. T. Shelton and his son, G. T., contracted with Annie L. Dobson to purchase 300 acres as to which a part seems to be included in the area which forms the subject-matter of this appeal, appellees elected to rest their claim upon adverse possession. It is agreed there have been accretions. Appellees insist appellants had notice for more than seven years that the acreage in question was claimed by Shelton. It is also averred there was acquiescence.

R. V. Hall, engineer, and W. L. King, surveyor, testified regarding river changes, natural and artificial markers, and other matters. Maps or charts were prepared, four by Hall and one by King. There are substantial differences between the drawings and testimony of these witnesses. [3]

---

[1] Taylor's interest was that of lessee, he having contracted in 1935 for a five-year period.

[2] The original suit was dismissed, then filed in Miller county. The defendants cross complained, alleging they were owners of lands which are described in a quotation appearing in the body of this opinion. The cause was transferred to chancery.

[3] Appellees argue that prior to 1915 the lands were located in an irregular "S" formed by Red river, meandered by the government in 1842:—"The upper loop or semicircle of the 'S' ran far to the west and enclosed lands known as Smith's bend located in Lafayette county. The lower loop, or semicircle of the 'S,' [extended] east and enclosed lands known as Duke's bend in Miller county. Prior to 1924 Annie L. Dobson owned the lands in Smith's bend, and in 1924 sold [by contract with bond for title] to J. T. and G. T. Shelton. In 1915 there was a cutoff in Lafayette county on the east side of Smith's bend,

King referred to field notes he had made and to a rough plat showing parts of fractional sections twenty-seven, twenty-eight, thirty-three, and thirty-four, township eighteen south, range twenty-six west. They cornered at a point 2,600 feet south of the indicated present south bank of Red river where, in relation to the lands contended for, the stream's bend describes an inverted "U." These corners are 2,350 feet east of a point on the east bank of the river within the "U," and 2,937 feet west of a point on the bank where the flow is northwest. Thence the stream gradually curves west, then southwest, and then south.

Appellees maintain that when the Sheltons contracted in 1924 to purchase from Annie L. Dobson, Mrs. Dobson and her husband went with' J. T. Shelton and pointed out boundaries of the lands described. Shelton claims he then went into possession. Further insistence is that there was a fence immediately north of land owned by Marcus A. Jacobs [4] in section thirty-three (Miller county) extending from an area referred to as the "blue hole" along the southern and eastern banks of what had formerly been Red river, but what is now commonly referred to as Old river. It is claimed the fence extended to where Red river cut through its banks in 1915 and created a new channel.

Appellants admit the Shelton contract of 1924 and say that the lands were in sections twenty-seven and thirty-four, east and south of Old river in Lafayette

[approximately] 700 feet west of the corner[s] of [fractional] sections 27, 28, 33, and 34. The [cut through] caused the river at this point to abruptly turn in a southerly direction. The river flowed through this cutoff southward into the old channel of Red river, (reversing the channel) to a second cutoff which occurred the same year on the west side of Duke's bend. Between 1915 and 1924 the old channel east of the cutoff across Smith's bend filled in. By reason of the abrupt turn, or 'elbow,' at the north end of the cutoff, the current's force caused the river to cave on the north and west sides and accretions to form on the east side, until by 1924 the river had moved in a westerly direction a quarter of a mile. Accretions formed to a line which covered and included the lands involved in this litigation. In the same year (1915) there was a cutoff at the western end of Duke's bend through which the river flowed from the northern cutoff going south. This cutoff, however, is not involved."

[4] Marcus A. Jacobs died in 1904, leaving his wife, Mrs. M. A. Jacobs, and two children: Raymond A. Jacobs, and Gertrude Jacobs Meleton.

county. One reference is to ". . . a part of section twenty-seven at the north end for a quarter of a mile [which] then abutted upon Red river." Appellants say they and their predecessors in title have owned lands in section thirty-three touching Red river for many years, and that they were such owners when the Sheltons contracted with Mrs. Dobson for acreage in sections twenty-seven and thirty-four.

Appellees predicate their claim upon J. T. Shelton's contention that in 1928 certain adjustments of differences were made, and thereafter, they say, it was generally understood that Shelton claimed the lands. There is testimony that north of Jacobs' holdings a fence was built from the blue hole to the cutoff of 1915, extending along the southern and eastern bank of Old river. In 1928 Mrs. Jacobs (owner of the land in Duke's Bend east of the cutoff) sold timber from it to a man named Gibson. Shelton and Gibson could not agree on lines, and, according to appellees, ". . . by mutual consent the fence was moved on the eastern and northern sides of the Jacobs lands to the center of Old river." [5] The fence is described in the margin.

Appellees emphasize that when the fence was reconstructed the Sheltons yielded lands equal in area to half the bed of Old river north and east of the Jacobs boundaries. However, it is reiterated that the enclosure soon thereafter completed embraced lands pointed to by Mrs. Dobson in 1924 as within boundaries of three hundred acres the Sheltons took possession of, less the relatively small amount between the east bank and center of Old river. Shelton's testimony regarding the agreement reached when the fence was moved is unequivocal, although he disclaimed an intent to appro-

[5] Continuing, the conditions described are: "Beginning with what is known as the blue hole [the fence] continued along the channel of Old river (which, since 1915, had become filled with soil) to a sassafras post located northwest and west thereof in the center of the channel; thence along the center of Old river to a cottonwood tree at the eastern edge of the cutoff. In the same year (1928) J. T. Shelton built a new fence from the cottonwood tree south along the east bluff [or] bank of the cutoff and the east bluff [or] bank of Old river (through which the cutoff waters originally flowed) to and into the running waters of Red river as it was then located."

priate any of the Jacobs lands. For ten years, says Shelton, he and his tenants "sprouted off" new land as it accreted, leveled it, and converted a part into meadows. Cotton and corn were planted and harvested; also beggarweed and hegari.[6] During winter months

The contention is stressed that the fence was substantial, consisting of four strands of barbed wire attached to posts appropriately set, or to trees when convenient. It was intended as a "line fence," rather than a temporary expediency to turn cattle. Its definite character was understood by all; nor was its utility questioned until 1938, when Allen, who is referred to as manager and general agent for the Jacobs family, dismantled it. There is this statement in appellee's brief:

"After each overflow either Allen and his tenants, or Shelton and his tenants, would repair damages. As the river moved westward or southward [the fence was thus rebuilt, extending] into the running waters of Red river."

In 1930 Anna L. Dobson, by deed, conveyed to the Sheltons the lands described in the 1924 contract. Included were "All of fractional south half of section twenty-eight—that is, all of said fractional subdivision lying on the southerly side of Old river in what is known as Smith's bend; all of fractional north half of section thirty-three—that is, all of said fractional subdivision lying on the northerly side of the existing channel of Red river in what is known as Smith's bend; all of fractional west half of the northwest quarter of section thirty-four—that is, all of said fractional subdivision lying on the easterly side of Old river; also all of fractional east half of the northwest quarter of section thirty-four—that is, all of said fractional subdivision lying on the easterly side of Old river."

These descriptions constitute a tongue of land extending from the northwest corner of section thirty-three east to the northeast corner of the northwest corner of section thirty-four—a mile and a half—as shown by the

---

[6] "Hegari" is a plant used for forage. It is also spelled "higear." the enclosure was used as a pasture.

map of township eighteen south, range twenty-six west, in Lafayette county.

A description of the land in dispute starts at a point 160 feet north and 340 feet east of the northwest corner of fractional northeast quarter of the northeast quarter of fractional section thirty-three. Thence, by various courses, it proceeds to a point on the east bank of Red river, ". . . thence in a northwesterly direction with the meanderings of the east bank of Red river to a point 160 feet north of the north line of section thirty-three, thence east 2,310 to the point of beginning."

The north line of the land described in the complaint extends in a westerly direction 1,970 feet (2,310 feet, less 340) or approximately thirty chains west from the northwest corner of the northeast quarter of the northeast quarter of section thirty-three. The distance from the northwest corner of the northeast quarter of the northeast quarter of section thirty-three to the northwest corner of section thirty-three is approximately sixty chains. Thus it will be seen that all of the lands described in the complaint as to which there is controversy falls within the bounds of those parts of sections twenty-eight and thirty-three conveyed by Dobson to the Sheltons.

In the cross complaint the land described is ". . . all that part of section thirty-three in township eighteen south, range twenty-six west, which lies in the bend and north and west of the center line of the channel or bend of the river as it existed prior to the cutoff of 1915, *and south of the present channel of Red river* as it flowed between the counties of Miller and Lafayette."

Appellants' exhibit "A" to Hall's testimony contains the notation: "Red river, 1842: from original field notes." The land runs through the south half of section twenty-eight, northwesterly through the southeast quarter of section twenty-nine, southeasterly through the northeast quarter of section thirty-two, and easterly and northeasterly through the north half of section thirty-three, with the two river channels approximately 1,000 feet apart at the east end. The eastern cutoff was through the area marked "cutoff 1915" in the southeast quarter

of section twenty-eight and the northeast quarter of section thirty-three.

Effect of the cutoff was to separate the lands Shelton and his son later bought in sections twenty-eight and thirty-three from similar lands in section thirty-four. The Jacobs lands were south of these holdings in section thirty-three, separated therefrom by the original river.

Appellants say that as a result of the 1915 avulsion the then main channel of Red river filled with silt, in consequence of which the Dobson and Jacobs lands became contiguous and have remained so ever since.

The court did not make findings distinguishing between original lands and accretions; but it is evident that during changing river channels land around and west of where sections twenty-seven, twenty-eight, thirty-three, and thirty-four cornered was not destroyed, although Hall disagrees with King as to location of the corners.

Hall's survey was made from the Miller county side of the river: King's from the Lafayette county side. The result is a difference of about 700 feet—that is, the corners as ascertained by Hall are 700 feet farther east than the corners designated by King. Testimony given by King and the plat to which he referred are based on the original U. S. government survey of fractional sections twenty-seven, twenty-eight, twenty-nine, thirty-two, thirty-three, and thirty-four, township eighteen south, range twenty-six west, east of Red river. The survey was made by John W. Garretson in November, 1845. It is on file in the state land office, and as to some of the records there we take judicial notice. Lands in the so-called ''tongue,'' mentioned by witnesses, is in sections twenty-eight, twenty-nine, thirty-two, thirty-three, and twenty-seven, although the property sold by Dobson to the Sheltons did not extend to sections twenty-nine and thirty-two.

Hall's testimony and plats are based on the original U. S. government survey of fractional section thirty-three ''on the southerly and westerly side of Red river,''

made by Israel M. Moore in December, 1841, and during January and February, 1842.

These are separate surveys and are independent of each other. An extension of the lines of either boundary of what was the "thread of the stream" of Red river in 1841 would be incorrect in respect of the other survey, except where the thread of the stream has shifted on account of erosion. Evidence shows that the thread of the stream remained in practically the same position from 1841 until 1915. The avulsion of 1915 does not appear to have changed boundary lines between counties or individuals.

Appellants think the acreage in question accreted to the Jacobs lands in Duke's bend in Miller county, building from the south to the north, extending beyond the channel of Red river as it existed in 1842. The flow, or force of the water in passing through the cutoff from its break south in section twenty-eight was southwestward across lands later purchased by the Sheltons from Dobson. The water reëntered Red river at a point in the northeastern part of section thirty-three. From the south or southwestern end of the cutoff in section thirty-three to the second cutoff farther west in section thirty-two, there was no avulsion and therefore no change of lines.

Due to a failure of witnesses to mark points on maps and plats which they seemingly indicated by gestures, it is impossible to accurately quote salient parts of the evidence. An example of the character of testimony is shown in the footnote.[7]

Irrespective of record titles as shown by exhibits and testimony, the chancellor's finding that Shelton had held adversely for more than seven years is not against

[7] While King was testifying he was asked, "How did the river act there about 1915?" Answer: "Well, all I've got to go by is just the old banks: the evidence is there. I presume it cut through from this point right here." Question by the court: "Does the cut show for itself?" A. "Yes, this bank here, that old 1915 bank. .There is a pecan tree and an old house on that, so the river there did cut this. You see, this is old virgin bank and the dwelling house was there. In 1927 this was the river line right here, right around here." [Other testimony is equally difficult to associate with a known point on map or plat.]

the weight of evidence. Witnesses were interrogated by the court at a time when maps were in use, and it must be assumed that facts indicated, but which in print are hardly more than inferences, were understood and accepted.

The decree is affirmed on appeal and on cross appeal.