

# Missouri Court of Appeals
## Southern District

### In Division

ROBERT AND SUSAN FERGUSON, )
et al., )
        Plaintiffs-Respondents, )
 )
        v. )      No. SD38532
 )
CITY OF SUNRISE BEACH, MISSOURI, )    **Filed: April 1, 2025**
 )
        Defendant-Appellant. )

APPEAL FROM THE CIRCUIT COURT OF CAMDEN COUNTY

The Honorable Kenneth M. Hayden, Judge

**VACATED AND REMANDED**

The City of Sunrise Beach, Missouri ("the City"), appeals the judgment of the Circuit Court of Camden County, Missouri ("trial court"), denying its Motion for Judgment Notwithstanding the Verdict ("JNOV") following a jury trial. In two points on appeal, the City claims the trial court erred in denying JNOV on Plaintiffs Fergusons', McGinleys', Lawheads', Gebharts', Seemayers', Vander Wells', and Aikeys' (collectively, "Respondents") nuisance claim (Point I) and negligence claim (Point II), both alleging property damage only, because Respondents' claims for loss of use and enjoyment of real property against one having the power of eminent domain, here the

1

City, must be asserted through an action for inverse condemnation. We agree and vacate the trial court's Judgment.

**Facts and Procedural History**

Respondents are past and current owners of eight separate lots within Scram Acres subdivision in the Village of Sunrise Beach. A creek runs through the Lawhead property, and the other Respondents own properties that abut the cove at the Lake of the Ozarks into which the creek empties. The creek begins by a wastewater facility, owned and operated by the City. The Lawhead family has access to the cove through an easement that runs along the creek. The other Respondents have access to a dock on the lake, pursuant to permits.

The City took over management of the wastewater treatment facility from LO Environmental ("LOE") in 2016.[1] The City placed employee Brian Scheiter, the City's Director of Public Works, in charge of the treatment plant. Bypasses occurred at the wastewater treatment facility during the period from 2016 through 2020 that should have been reported, but were not. A "bypass" referred to a leak or failure of the system, and bypasses were required to be reported to the State if they occurred.

Respondents originally filed suit against the City in March of 2020, with a Fourth Amended Petition being filed December 30, 2022. Respondents claimed that the City's employees released improperly treated wastewater from the treatment plant. Respondents asserted that the alleged release "onto the City's land . . . created a dangerous condition on the City's land at its wastewater treatment plant." They also alleged that the "dangerous condition . . . at the City's wastewater treatment plant caused

---

[1] LOE settled the claims against it during trial.

2

untreated wastewater to migrate to the creek and cove near [Respondent]s' properties"

and that the "improperly treated wastewater contained high levels of e-coli [sic] and other

contaminants harmful to human health that [have] negatively impacted [Respondent]s'

properties and [Respondent]s' use and enjoyment of their properties."

The City filed a Motion to Dismiss and a Motion for Complete Summary

Judgment, in which it claimed Respondents were required to bring their causes of action

through inverse condemnation.  The trial court denied both motions.

Respondents proceeded to trial alleging two claims sounding in tort against the

City; Count I alleged liability for nuisance and Count II alleged liability for negligence

based on the same nuisance.  Respondents claimed that micro-organisms (such as E. coli)

and metals (such as lead and arsenic) were spilled at and discharged from the wastewater

plant; that the micro-organisms and metals flowed from the wastewater plant onto the

Respondents' properties and into the Lake of the Ozarks near their land; and that the

micro-organisms and metals adversely impacted their use and enjoyment of their

properties.  The City moved for directed verdict on both counts at the close of

Respondents' evidence, which the trial court overruled.  The City again moved for

directed verdict at the close of all the evidence, and repeatedly argued that Respondents'

claims were required to be brought through claims for inverse condemnation.

During trial, an employee at the wastewater treatment facility between 2018 and

2019 ("Employee"), testified Mr. Scheiter was purposefully skipping vital purification

processes in order to "save money with the City" that "would equate to a raise."  Mr.

Scheiter passed along his inaccurate practices by training Employee to do water quality

tests that were supposed to be two-hour tests in only 45 minutes, and would reportedly

3

"ma[ke] up" sample measurements. Further, the facility's charcoal filters, which were used to purify the wastewater, were shut off 90% of the time he worked there, resulting in sewage not being filtered.

The facility also contained two grinders to grind sludge produced at the facility; Employee testified that during his employment, the grinders were never connected to electricity and were not working. The lack of grinders resulted in the aeration basins becoming over-saturated with sludge, which would then migrate to the UV tank and prevent the UV lights from disinfecting the wastewater. The sludge would be pumped out of the facility and eventually make its way into Respondents' properties. In October of 2019, Employee observed Mr. Scheiter pumping sewage into the UV trench and under the facility's fence, toward the creek. Employee realized the impropriety of Mr. Scheiter's actions after taking a training course, where the instructor told him that what they were doing was illegal.

Employee discussed the illegality of the matter with Mr. Scheiter, to which Mr. Scheiter responded "how would they know unless [Employee] ran [his] mouth?" Employee raised the issue at a City Hall meeting in October of 2019, where he was told that the City's attorneys would "make[] these things go away" and that he needed to follow Mr. Scheiter's advice. Employee was fired after responding that the actions were illegal.

Respondents continuously used the creek and cove during this time: Respondent Melissa Lawhead testified that she wanted her kids to experience living and utilizing the lake; Respondent Robert Ferguson described swimming with his children and

4

grandchildren around their dock; and Respondent Michael McGinley testified to his children playing in the water during rainstorms.

Ms. Lawhead testified at trial that she first noticed issues in 2017, when she saw trees dying by the creek. She testified that she informed Mr. Scheiter of the issue, and he told her the trees were dying because they were "overloaded with water." After this, she noticed "[c]ertain smells throughout the summertime[,]" and had to keep her windows closed because of the smell of sewage. The smell became so overwhelming in May of 2019 that Ms. Lawhead contacted the City. Mr. Scheiter told Ms. Lawhead that there was an issue with a pump at the facility, but that it was promptly fixed and would not happen again.

Ms. Lawhead testified that she had several follow-up conversations with Mr. Scheiter about the color of the water, to which he responded that the water was safe because it went through a UV light purifier. Ms. Lawhead called the Missouri Department of Natural Resources ("MDNR") about the problem about a dozen times, and in January of 2020, she walked the creek with MDNR investigators. She testified to hearing the MDNR investigators discussing the water, saying, "This is not right. This should not look like this."

Respondents called James Harrington as an expert witness at trial, who investigated their claims by completing soil and water analysis data. He testified that based on his understanding of how the wastewater treatment facility had been operated, he would expect metals and other organic materials, including E. coli, to be in the sludge that was discharged into the creek and cove. Mr. Harrington testified that samples taken, in May of 2020, showed extremely elevated levels of E. coli at several locations in the

5

creek, at the lake shore, and the cove. Another sampling report, from July of 2022, showed heavy metals in the creek and cove. Mr. Harrington testified that these metals "are another way of measuring potential impacts from wastewater and sewage." Mr. Harrington stated that the elevated levels of organic materials and metals told him

> that there is an impact from a source of materials that contain both organic matter and metals and that they had been deposited into the stream in this location and into the cove, and that they have persisted in the environment in those locations for at least some time, and that's why they're still present here. It's essentially a fingerprint of pollution is the way I would read this.

He then testified that the wastewater treatment facility was the "most likely source" for this pollution. Based on his full analysis, Mr. Harrington testified to the following opinion:

> My opinion is that the sewage treatment facility discharged sludge and bypassed untreated wastewater at times in the 2016 to 2020 time frame; and that during that time frame it discharged both E. Coli and metals into the stream, and they traveled from the stream into the cove; and that the shoreline of the stream and the beach area of those homes has been impacted by the sewage treatment sludge that has deposited metals and E. Coli, some of which persists [sic] to this time; and that those materials have created something akin to what you would consider a stain, a residual impact that remains now present at that location.

All Respondents testified to their loss of enjoyment of their property resulting from the contamination. The jury returned verdicts for all Respondents on their negligence claims, but only for the Fergusons, Lawheads, McGinleys, Seemayers, Aikeys, and one of the Vander Well families on the nuisance claims. The trial court entered its Judgment on the jury's verdicts on March 7, 2024.

The City moved for JNOV and for a new trial or in the alternative for remittitur. Both motions were denied. This timely appeal follows.

6

**Points on Appeal**

Points I and II

In both points on appeal, the City argues that the trial court erred in denying JNOV in that Respondents were required to bring their nuisance claim (Point I) and their negligence claim (Point II) through an action for inverse condemnation. We agree.

*Standard of Review*

"Our review of the trial court's judgment granting [or denying] a motion for JNOV is essentially the same as our standard of review of the trial court's granting [or denying] of a motion for directed verdict." ***Dunn v. Enterprise Rent-A-Car Co.***, 170 S.W.3d 1, 11 (Mo. App. E.D. 2005) (citing ***Giddens v. Kansas City S. Ry. Co.***, 29 S.W.3d 813, 818 (Mo. banc 2000), *cert. denied*, 532 U.S. 990 (2001)). The standard of review for an appeal challenging a trial court's decision on a motion for directed verdict is *de novo*. ***Walsh v. City of Kansas***, 481 S.W.3d 97, 111 (Mo. App. W.D. 2016). Under the *de novo* standard, we look to the issues presented on appeal as the trial court should have initially, and we grant no deference to the trial court's ruling. ***Garner v. AMCO Ins. Co.***, 670 S.W.3d 172, 176 (Mo. App. S.D. 2023). "If the grant or denial of a directed verdict or [JNOV] is based upon a conclusion of law, this court reviews the trial court's decision *de novo*." ***Ozark Emp. Specialists, Inc. v. Beeman***, 80 S.W.3d 882, 889 (Mo. App. W.D. 2002).

"A [JNOV] is appropriate only if [the nonmoving] party fails to make a submissible case." ***Bland v. IMCO Recycling, Inc.***, 67 S.W.3d 673, 682 (Mo. App. S.D. 2002). We must determine whether a submissible case was made, in which the appellant provides "substantial evidence for every fact essential to recovery[.]" ***Darks v. Jackson***

*County*, 601 S.W.3d 247, 258 (Mo. App. W.D. 2020) (quoting ***Mercer v. BusComm, Inc.***, 515 S.W.3d 238, 242 (Mo. App. E.D. 2017)). "Substantial evidence is that which, if true, has probative force upon the issues, and from which the trier of fact can reasonably decide a case." ***Arkansas-Missouri Forest Products, LLC v. Lerner***, 486 S.W.3d 438, 447 (Mo. App. E.D. 2016) (quoting ***Moore ex rel. Moore v. Bi-State Dev. Agency***, 87 S.W.3d 279, 286 (Mo. App. E.D. 2002), *abrogated on other grounds by **Goldsby v. Lombardi***, 559 S.W.3d 878, 883 n.3 (Mo. banc 2018)).

*Analysis*

In Point I, the City first argues that Respondents were required to bring their nuisance claim through an action for inverse condemnation because the sole remedy for damage to property by a political subdivision with eminent domain authority based on nuisance is through an action for inverse condemnation. The City makes the same argument in Point II with regard to Respondents' negligence claim. The City thus claims the trial court erred in denying JNOV by misapplying the law because Respondents were not entitled to bring their claims through any method other than inverse condemnation. Respondents argue that the City's argument ignores the impact of section 537.600.1, Missouri's sovereign immunity statute.[2] They argue that Missouri law provides "two avenues for relief against public entities that enjoy some degree of sovereign immunity[,]" one being a constitutional right to compensation by stating a claim for inverse condemnation and the other by bringing common-law tort claims against a public entity if that public entity's immunity has been expressly waived by statute. We agree with the City. Because the Respondents alleged damage to their private property against

_____

[2] All statutory references are to RSMo 2016, unless otherwise indicated.

8

an entity having the power of eminent domain, they were required to assert their claim through an inverse condemnation action.

Article I, section 26 of the Missouri Constitution provides: "That private property shall not be taken or damaged for public use without just compensation." "Inverse condemnation is a cause of action against a governmental agency to recover the value of the property taken by the agency, though no formal exercise of the power of eminent domain has been completed." *County of Scotland v. Mo. Pub. Entity Risk Mgmt. Fund*, 537 S.W.3d 358, 364-65 (Mo. App. W.D. 2017) (quoting *Dulany v. Mo. Pac. R.R. Co.*, 766 S.W.2d 645, 648 (Mo. App. W.D. 1988)). Inverse condemnation is the exclusive and proper remedy for an alleged nuisance or other damage caused to private property by an entity having the power of eminent domain. *Basham v. City of Cuba*, 257 S.W.3d 650, 653 (Mo. App. S.D. 2008) (holding "[i]nverse condemnation is the exclusive remedy when private property is damaged by a nuisance operated by an entity having the power of eminent domain"); *George Ward Builders, Inc. v. City of Lee's Summit*, 157 S.W.3d 644, 650 (Mo. App. W.D. 2004) (holding the trial court properly dismissed plaintiff's petition for temporary nuisance because the exclusive and proper remedy for damage to private property caused by a nuisance maintained by a public entity having the power of eminent domain is an action in inverse condemnation, and a claim based on a theory of nuisance is no longer viable); *Byrom v. Little Blue Valley Sewer District*, 16 S.W.3d 573, 577-78 (Mo. banc 2000) (holding inverse condemnation is the exclusive remedy for damage to property from either a temporary or permanent nuisance); *Heins Implement*

***Co. v. Mo. Highway & Transp. Com'n***, 859 S.W.2d 681, 693 (Mo. banc 1993)[3] (holding when private property is damaged by a nuisance operated by a public entity with condemning authority, regardless of whether the nuisance is temporary or permanent, the exclusive and proper remedy is inverse condemnation); ***Clay v. Mo. Highway & Transp. Comm'n***, 951 S.W.2d 617, 628 (Mo. App. W.D. 1997) (holding that in cases where plaintiffs were seeking to recover for damages to their own property, "inverse condemnation has been held to be the exclusive and proper remedy," interpreting ***Heins***); ***Stewart v. City of Marshfield***, 431 S.W.2d 819 (Mo. App. Spfld.D. 1968) (citing ***Stewart v. City of Springfield***, 165 S.W.2d 262, 630 (Mo. banc 1942)) (holding "[w]e find it a common rule that 'the discharge of sewage upon the property of an individual, or its discharge into a stream, so as to pollute the water and lessen or destroy the value of the stream itself, or of private property situated thereon, is generally considered compensable under eminent domain provisions"); ***Lewis v. City of Potosi***, 317 S.W.2d 623, 629 (Mo. App. St.L.D. 1958) (holding when a nuisance which results and follows for the turning of sewage into a water course, the law of eminent domain applies instead of the law of nuisance, being the landowner's one and only right of action). "[N]o cause of action for

---

[3] ***Heins*** was abrogated on other grounds by ***Southers v. City of Farmington***, 263 S.W.3d 603, 612-14 n.13 (Mo. banc 2008) (holding that public duty doctrine does not insulate government entities from tort liability where the legislature has expressly abolished such immunity). Respondents argue that ***Southers*** allows plaintiffs to bring tort claims of their choosing, so Respondents' claims against the City are therefore viable. We do not read the narrow holding related to the public duty doctrine in ***Southers***, an action against a city and police officers to recover wrongful death damages following the deaths of two motorists in a traffic collision with a speeding police vehicle, to so hold or to affect the ***Heins*** Court's holding relevant to this action.

nuisance exists against municipalities with condemning authority." *George Ward Builders, Inc.*, 157 S.W.3d at 648.

Here, Respondents only seek damages for loss of use and enjoyment of their real properties caused by the City's actions. By making such a claim, they claimed that an entity with the power of eminent domain took privileges away from them regarding their use and enjoyment of their properties. Respondents do not dispute that the City has the power of eminent domain in this case. Respondents chose to assert tort claims for damages, but those claims have been foreclosed against the City, which holds the power of eminent domain.

Respondents argue this Court should follow the courts' decisions in *Byrom v. Little Blue Valley Sewer Dist.*, 825 S.W.2d 304 (Mo. App. W.D. 1991), and *Eppenberger v. Metropolitan St. Louis Sewer Dist.*, 344 S.W.3d 226 (Mo. App. E.D. 2011), and hold that the immunity waiver in section 537.600.1(2) permits Respondents' tort claims for negligence and nuisance in this case. Neither case determined tort claims for damages to property could be made against a public entity holding the power of eminent domain. This Court declines to engage in Respondents' expansive readings of these cases to reach Respondents' desired result. Those courts' various holdings simply do not reach any such conclusion, nor do they effectually extinguish the binding precedent that has existed for decades regarding claims of this nature against public entities – that inverse condemnation is the exclusive and proper remedy for an alleged nuisance or other damage caused to private property by an entity having the power of eminent domain.

11

In *Eppenberger*, homeowner asserted a cause of action against the district "for a known dangerous condition of the River des Peres and *inverse condemnation* in connection with the flooding of their homes." 344 S.W.3d at 227 (emphasis added). The sewer district's motion for summary judgment presented one issue to the trial court, whether the homeowner could demonstrate there was a dangerous condition based upon the sufficiency of his pleadings. *Id.* at 228. The trial court granted the sewer district's motion because the sewer district "demonstrated that as a matter of law, [h]omeowner would be unable to prove a waiver of sovereign immunity." *Id.* In doing so, the court found that the homeowner's petition alleged "more than mere intangible acts or preventative measures in an attempt to waive [the district's] sovereign immunity" and that a triable issue existed as to whether the sewer district's acts in reshaping the river created a dangerous condition waiving sovereign immunity. *Id.* From what we are able to glean from the case factually, the only cause of action pled against the sewer district was inverse condemnation. There is no explanation given as to why a waiver was necessary pursuant to section 537.600.1(2) for the inverse condemnation action since a plaintiff does not have to overcome sovereign immunity to bring a constitutional claim for inverse condemnation. *See Clay Cnty. Realty Co. v. City of Gladstone*, 254 S.W.3d 859, 866 (Mo. banc 2008). We do not, however, read this case to suggest what Respondents argue, that a "dangerous condition" claim constituted a tort claim properly brought by the plaintiffs. The *Eppenberger* court did not hold that a nuisance cause of action can be maintained against an entity having the power of eminent domain as that question was not before the court. 344 S.W.3d at 227-29. Moreover, plaintiffs asserted a

12

claim for inverse condemnation in connection with the flooding of their homes. *Id.* at 227.

Additionally, two separate decisions have been issued in the ***Byrom v. Little Blue Valley Sewer District*** case by our appellate courts, one by the Western District ("***Byrom I***") and one by our Supreme Court ("***Byrom II***"). Robert Byrom and several others filed suit against the Little Blue Valley Sewer District for damages resulting from the operation of a sewage disposal plant. ***Byrom I***, 825 S.W.2d at 305. The petition originally alleged, in three separate counts on theories of nuisance, injunction, and damages for personal injury, the sewer district's treatment plant, including the treatment basins, were defectively constructed and as a result raw sewage was discharged onto adjoining land and into the Missouri River, along with fumes and odors containing toxic chemicals being emitted into the air. *Id.* at 305-06. The sewer district filed a motion to dismiss on the ground it was immune from liability under the doctrine of sovereign immunity. *Id.* at 305. The trial court granted the sewer district's motion to dismiss and the plaintiffs appealed, alleging the petition stated a cause of action within the exception set out in section 537.600.1(2). *Id.* The only question presented to the trial court and thus, the contested issue on appeal, was whether the petition alleged facts that demonstrated a dangerous condition of the sewer district's property. *Id.* at 306. The court concluded, treating the allegations as true as it was required to do under the requisite standard of review for the granting of a motion to dismiss, the petition sufficiently alleged a dangerous condition on the sewer district's property. *Id.* The appellate court did not decide whether the causes of action pled by the plaintiffs were

proper, and did not condone the filing of tort claims against a public entity with condemning authority.  *Id.*

In the second *Byrom* appeal, the sewer district appealed the trial court's judgment awarding damages to plaintiffs claiming the plaintiffs' nuisance suit was barred by sovereign immunity and even if the plaintiffs were entitled to recover damages for inverse condemnation, the trial court erred in computing damages.  *Byrom II*, 16 S.W.3d at 574-75.  In reviewing the case, our Supreme Court noted, "In their petition, they alleged the [s]ewer [d]istrict negligently operated the plant in a dangerous condition. Thus, they appeared originally to have intended to litigate a *tort* claim for their *personal injuries* under section 537.600.1, RSMo 1994, in addition to a *condemnation* claim for their *property* damage."  *Id.* at 575.  The Supreme Court also noted that the plaintiffs "amended their pleadings at the end of trial to rely exclusively on inverse condemnation" and "at oral argument, counsel for [plaintiffs] admitted he abandoned a negligence suit based in tort before trial began in this case."  *Id.* at 576.  The Supreme Court reviewed the case as one awarding damages for property injury based on principles of inverse condemnation, where the plaintiffs' only claim was that the odors caused them to lose the full use and enjoyment of their property.  *Id.*  The Supreme Court stated, "Absent a claim for personal injury and a waiver of sovereign immunity under section 537.600.1, recovery for nuisance is more limited when, as here, a public entity is the defendant."  *Id.* at 576-77.  The Court also cited to its decision in *Heins* noting "when private *property* is damaged by a nuisance operated by an entity having the power of eminent domain, the proper remedy is an action in inverse condemnation."  *Id.* at 577 (quoting *Heins*, 859 S.W.2d at 693).  In doing so, the Court determined "Article 1, section 26 of the Missouri

14

Constitution provides, 'that private property shall not be taken or *damaged* for public use without just compensation.'" *Id.* at 577. "Recovery for a physical injury and loss of the use and enjoyment of property itself is not appropriate for an inverse condemnation claim, although such injuries may be relevant to calculating the lost value of the property." *Id.* at 578. The Court ultimately determined the trial court erred by awarding the plaintiffs damages for their physical suffering and loss of use and enjoyment of their homes apart from its effect on the market or rental value of their property, and further determined plaintiffs failed to present any evidence regarding the value of their properties. *Id.* They further held "the attempt to award damages for personal injuries in a *nuisance-based* inverse condemnation case for injury to property is erroneous as a matter of law." *Id.* In reversing the trial court's decision, the Supreme Court determined plaintiffs "are not entitled to recover for the loss of use and enjoyment of their property caused by the odors apart from how that loss affects the overall lost value in their property rights." *Id.*

This Court further determines the facts in *Heins* are similar to the facts before us in this case and that the Supreme Court's holding with regard to the issues before us in this appeal are still good law. In that case, the plaintiffs filed suit against the Missouri Highway and Transportation Commission ("MHTC"), its design engineer, general contractor, and others after a raised bypass with an inadequate drainage culvert completed as a part of a highway bypass project acted as a dam causing flooding to plaintiffs' properties. 859 S.W.2d at 684. Specifically, plaintiffs alleged causes of action for negligence, nuisance, and inverse condemnation against MHTC. *Id.* at 684. The trial court granted summary judgment on the negligence and nuisance claims, and the inverse

15

condemnation claims were tried to a jury. *Id.* On appeal, the plaintiffs argued that their negligence and nuisance claims against MHTC were not barred by sovereign immunity. *Id.* at 693. The Court concluded that, "when private property is damaged by a nuisance operated by an entity having the power of eminent domain, the proper remedy is an action in inverse condemnation." *Id.* (citing *Green Acres Land & Cattle Co. v. State*, 766 S.W.2d 649, 651 (Mo. App. W.D. 1988); *Harris v. Mo. Dept. of Conservation*, 755 S.W.2d 726, 729 (Mo. App. W.D. 1988)). "The fact that the nuisance is alleged to have been caused by the public entity's negligence is immaterial." *Id.* at 693-94 (citing *Page v. Metro. St. Louis Sewer Dist.*, 377 S.W.2d 348, 353-54 (Mo. 1964)). The Court ultimately held, "[b]ecause MHTC is empowered to exercise the right of eminent domain, [section] 277.120, RSMo 1986, the trial court did not err in dropping appellants' nuisance and negligence claims while retaining their inverse condemnation claims." *Id.* at 694.

This Court concludes, in accordance with the precedent cited and analyzed herein, that a nuisance claim or negligence claim alleging injury to property may not be substituted for a claim of inverse condemnation so long as the public entity is one having the power of eminent domain.[4] The City has the power of eminent domain here. Thus, Respondents' tort claims for property damage against the City should have been made under a claim for inverse condemnation, not claims for nuisance or negligence. Respondents' tort claims are not viable here. Respondents argue they are left without a remedy for their property damage claims, including their loss of use claims, in the absence of tort claims. This is not the case. Respondents simply have an exclusive

---

[4] Because we so hold, we do not analyze whether the City has waived its sovereign immunity under section 537.600.1.

16

remedy through inverse condemnation. The *Byrom II* Court made clear that loss of use resulting from odor and other impacts of a nuisance is not damages, rather it is a part of analyzing "what the property is fairly worth for the time during which it is held[.]" *Byrom II*, 16 S.W.3d at 577 (quoting *City of Cape Girardeau v. Hunze*, 284 S.W. 471, 480 (Mo. 1926)). The loss of use is instead a factor to be considered when valuing the properties for inverse condemnation purposes. The trial court erred in not granting the City's JNOV.

In addition, clearly Respondents and the trial court misconceived the law regarding Respondents' claims against the City from the onset, despite the City raising the pleading issues at every available opportunity throughout the case. "[W]here a plaintiff has from the outset misconceived the law and has chosen a mistaken legal theory to submit to the jury for redress, we may reverse the judgment . . . and remand the cause to allow the plaintiff to plead and to submit another theory." *George Ward Builders, Inc.*, 157 S.W.3d at 651 (quoting *Blaine v. J.E. Jones Constr. Co.*, 841 S.W.2d 703, 710 (Mo. App. E.D. 1992)). "Simple fairness requires the [Respondents] be given a meaningful day in court." *Id.* However, "[r]emand will not be permitted if the record shows that [Respondents] deliberately chose [their] legal theory – in lieu of other legal theories – to gain strategic advantage." *Id.* We determine from the record that Respondents did not choose to assert their claims for nuisance and negligence as a matter of trial strategy, but that they mistakenly believed their tort claims, with a valid waiver pursuant to section 537.600.1, could be brought in lieu of an inverse condemnation claim. Simple fairness requires this Court to remand the case and give Respondents the opportunity to amend their petition to assert claims for inverse condemnation. Provided

the amended petition states causes of action for inverse condemnation, the case shall be allowed to proceed. If the amended petition does not state such claims for inverse condemnation, the trial court shall dismiss the claim with prejudice.

The trial court's Judgment is vacated. The cause is remanded for further proceedings consistent with this opinion.

JENNIFER R. GROWCOCK, C.J. – OPINION AUTHOR

JEFFREY W. BATES, J. – CONCURS

BECKY J. WEST, J. – CONCURS